**MUSEBECK, Barbara by MUSEBECK, Hazel Guardian-ad-litem**

v.

**HECKLER, Margaret, Secretary, Dept. of Health & Human Services, United States of America.**

Civ. A. No. 84–1997.

United States District Court, E.D. Pennsylvania.

Aug. 2, 1985.

Nancy Schuster, Bristol, Pa., for plaintiff.

Rachel Shao, Asst. U.S. Atty., Philadelphia, Pa., for defendant.

## MEMORANDUM

CLIFFORD SCOTT GREEN, District Judge.

This is an appeal under sections 205(g) and 1631(c)(3) of the Social Security Act ("Act"), 42 U.S.C. §§ 405(g) and 1383(c)(3) (1982), from a final decision of the Secretary of Health and Human Services ("Secretary") finding that plaintiff, Barbara Musebeck, engaged in substantial gainful activity during a nine month period (January-June, August-October) in 1980 ("critical period"), and therefore was no longer disabled as of November, 1980. For reasons demonstrated below, I find that plaintiff's clearly subsidized earnings, standing alone, do not constitute substantial evidence of substantial gainful activity. Moreover, because there is an abundance of evidence that plaintiff was not in fact performing substantial gainful activity, I reverse.

### I. *Plaintiff's Medical History*

Musebeck who is thirty years of age has been receiving psychiatric treatment since early childhood. The record clearly reflects that throughout her life she has undergone numerous psychiatric hospitalizations. She has been variously diagnosed as suffering from organic brain syndrome, explosive personality, temporal lobe epilepsy, borderline personality disorder and manic depressive illness. Plaintiff applied for and became a recipient of Supplemental Security Income ("SSI") benefits beginning in June, 1977.

In May of 1977, she came under the care and treatment of Doctor William Boehmler. Dr. Boehmler treated Musebeck from May, 1977 through November, 1981. He reported that during this treatment period plaintiff never "achieve[d] a level of functioning that was to be construed of as independent." (Tr. 346). Subsequent to November, 1981 Musebeck underwent five psychiatric hospitalizations in a period ending April 30, 1982. The behaviors which led to these hospitalizations included impulsive anger, destruction of furniture, assaultive behaviors, suicidal gestures, compulsive thoughts, staggering gait and hand tremors. The examiners noted her inability to do two-step commands, as well as abnormal tracings on electroencephalograms.

In July, 1982, Musebeck was committed to Norristown State Hospital. She was discharged in November of 1984 into a community living arrangement under the auspices of the Bristol-Bensalem Mental Health Center.

### II. *Plaintiff's Employment History*

Musebeck was first employed after graduating from special education classes in high school. She worked as a dietary helper at a nursing home for approximately one and one-half years (1974–75).

Plaintiff next worked in a sheltered workshop/group therapy program as a commuting outpatient from Norristown State Hospital where she was undergoing her fifth psychiatric hospitalization. She began work with this program in March of

1976. In November of 1976, she was discharged and continued her work as a live in resident at the program's facilities until February, 1977 when she was terminated due to behavioral problems and was once again psychiatrically hospitalized. She earned two dollars a week during her tenure of employment.

Following other therapeutic residential placements, Musebeck returned to the workshop program in January, 1978 and continued until she was once again terminated due to violent behavior in March of 1979.

From May until December of 1979, plaintiff was employed by Associated Production Services ("APS"). She worked in this sheltered workshop program in a closely supervised setting. According to Jonathan Belding, the program's executive director, Musebeck produced "at approximately 50% of the rate required in a competitive industrial setting." (Tr. 300) When referring to plaintiff's tenure with APS, Belding felt constrained to "qualify the word employment", preferring rather to characterize her participation as "training." (Tr. 302) Musebeck earned $1017.30 for the May-December 1979 period, an average of $127.16 per month. (Tr. 180)

### A. Critical Employment Period

Plaintiff left the APS workshop in December, 1979 and began participating in a Comprehensive Employment Training Act ("CETA"), 29 U.S.C. § 801–999 (1973), *repealed by*, Pub.L. No. 97–300, title I, § 184(a)(1), 96 Stat. 1357 (1982), program. Under the CETA program, she worked as a stock clerk at the Navy Exchange, Willow Grove Naval Air Station. She was employed as a stock clerk during a 6-month training program which ended in June,

1980. During that six month period (Jan.-June 1980) she underwent various treatments and had various incidents due to her assaultive behavior and psychiatric problems.[1]

On August 2, 1980, Musebeck was hired by the Navy Exchange under a special program within which she could continue her work as a stock clerk. She continued there until she was terminated in August of 1982. Barbara O'Boyle, the personnel clerk at the Navy Exchange described plaintiff's overall performance during the CETA program and thereafter as follows:

It was clear even in the beginning that she couldn't keep up with the other stock clerks. There were days when I would characterize her work as of little use to the Exchange. This situation got progressively worse as time went on. I do remember a number of occasions when it was necessary to send her home in the middle of the day because she was emotionally distraught (depressed), or she had forgotten her medication. We felt at times that she might present a danger to herself or someone else. She missed a great deal of work due to her emotional problems, particularly towards the end of the employment.

(Tr. 298–99). Ms. O'Boyle also described the duties normally required of a person holding the stock clerk position and how Musebeck was only capable of performing half of those duties. She felt that plaintiff "require[d] closer supervision than the other employees." (Tr. 298) Ms. O'Boyle remarked of "special considerations" given Musebeck:

She was clearly a handicapped individual and we were willing to put up with a great many behavioral and attendance problems before we found that we could no longer continue to employ her. If we

---

1. In February, plaintiff was seen at the Doylestown Emergency Room for "nervousness, tremor of the hands and legs and nausea." (Tr. 323) In March, she threatened with a butcher knife a worker at the Bucks County Association for Retarded Citizens Community Living Arrangement ("BARC–CLA") where she had resided since mid-1979. In April, she became violent again—attacking two BARC–CLA staff members. She was then discharged from BARC–CLA. In May, she underwent psychological evaluation by Dr. Charles Kaska. He found plaintiff significantly limited in terms of academic achievement with a "mid-fourth grade level in arithmetic" and "early seventh grade level in reading" with the ability to "give back approximately 25% of material" at the minimum level of literacy. (Tr. 227)

did not have a special policy for hiring people with problems such as hers, I would doubt that we would have been able to employ her for as long as we did. (Tr. 299)

In the first nine months of her employment at the Exchange, the critical period, Musebeck earned at least $3,170.65. It is possible that she earned up to $3,608.40.[2] If the lower figure is used, she had a monthly average earnings of $352.94; if the higher figure is used then her monthly average would have been $400.93. Either way her earnings were above an average of $300 per month. Musebeck earned $384.40 in November, 1980 and $398.40 in December of that year.

The record fails to reflect that plaintiff's earnings ever exceeded the $300 level for any month after December, 1980.

### III. *The Secretary's Action*

Initially, Musebeck was notified that because she had engaged in substantial gainful activity as of February 1980, her eligibility for SSI benefits had ceased in April of that year.

In March of 1981, plaintiff filed a timely request for reconsideration of the Secretary's initial termination decision. This request was denied. Subsequently, Musebeck requested a hearing, and a hearing was held before an Administrative Law Judge ("ALJ") in November of 1981. Plaintiff was unable to appear due to yet another hospitalization for psychiatric treatment. Hazel Musebeck, plaintiff's mother and guardian *ad litem,* offered testimony in her daughter's behalf.

In his decision of October, 1982, the ALJ essentially reaffirmed the Secretary's prior position. Thereafter, plaintiff petitioned the Appeals Council for review of the ALJ's decision. The Appeals Council granted review, and by decision dated February 27, 1984 found that Musebeck had engaged in substantial gainful activity for

a nine month period in 1980 (January-June, August-October), that Musebeck's disability had ceased in November 1980, and that her eligibility for SSI benefits had ceased in January of 1981. It is this final decision that plaintiff seeks this court to review in this action.

### IV. *Analysis*

■ By statute, this court's review of the Secretary's action in this case is limited to the question of whether her decision is supported by substantial evidence. *See* 42 U.S.C. § 405(g). Additionally, the Act, as amended by the Social Security Disability Reform Act of 1984, Pub.L. No. 98–460, 98 Stat. 1794, provides that the Secretary may terminate a recipient's benefits only upon "a finding that the physical or mental impairment" that forms the basis of such benefits "has ceased, does not exist, or is not disabling ..." 42 U.S.C. § 423(f). In the instant case the above mentioned finding must be based on "substantial evidence which demonstrates that ... the individual is now able to engage in substantial gainful activity ..." 42 U.S.C. § 423(f)(1)(B)(i). Thus, there must be substantial evidence of record that Musebeck can engage in substantial gainful activity.

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971). Substantial evidence is more than a mere scintilla, but may be somewhat less than a preponderance. *Dobrowolsky v. Califano,* 606 F.2d 403, 406 (3d Cir.1979).

The Secretary attempts to support her finding of substantial gainful employment in this case through her reliance on 20 C.F.R. § 416.974 (1984). That regulation provides in pertinent part:

(2) *Earnings that will ORDINARILY show that you have engaged in substantial gainful activity.* We will consider that your earnings from your work activ-

---

**2.** The record reflects conflicting data with regard to plaintiff's earning for August, September and October of 1980.

ities as an employee show that you have engaged in substantial gainful activity if—

(vi) Your earnings averaged more than $300 a month in calendar years after 1979.

(Italics in original, capitalization added). The Secretary urges that plaintiff's earnings during the critical period in 1980 average in excess of $300 per month and therefore plaintiff is no longer disabled. Such a misapplication of her own regulation cannot be substantial evidence to support the Secretary's finding herein.

■ The above quoted regulation plainly states that such earnings will *ordinarily* demonstrate substantial gainful activity. Thus, substantial gainful activity is not conclusively shown "when a magic number on the earnings scale appears." *Coulter v. Weinberger*, 527 F.2d 224, 229 (3d Cir. 1975). Substantial gainful activity "consist[s] of two distinct, albeit interrelated, components: compensation *and* the *substantiality of the activity itself.*" *Patane v. Harris*, 507 F.Supp. 115, 117 (E.D.Pa. 1981) (first emphasis in original, second added). It is beyond doubt that the specific activity that the claimant performs must be considered: "If you are doing work that involves minimal duties that make little or no demands on you and *that are of little or no use* to your employer ... this does not show that you are working at the substantial gainful activity level." 20 C.F.R. § 416.973 (1984) (emphasis added) *see also Chicager v. Califano*, 574 F.2d 161, 163 (3d Cir. 1978). It is uncontradicted in the record that Musebeck's work during the critical period was "of little use to the Exchange". (Tr. 288)

It is equally beyond doubt that how well the claimant performs the specific activity must also be considered. *See Chicager v. Califano, supra* at 163; *Stark v. Weinberger*, 497 F.2d 1092, 1100 (7th Cir.1974) (Stevens, J.); *Leibel v. Harris*, 493 F.Supp. 132, 134 (E.D.Pa.1980). The Secretary's own regulations also raise this consideration: "If you are unable, because of your impairments, to do ordinary or simple tasks

satisfactorily without more supervision or assistance than is usually given other people doing similar work, this may show that you are not working at the substantial gainful activity level." 20 C.F.R. § 416.973(b) (1984). Also uncontradicted in the record is the fact that because of her illness Musebeck required "closer supervision than the other employees." (Tr. 298)

■ Other indicators of a claimant's quality of performance which point to a lack of substantial gainful activity despite earnings are (1) a high absence rate, *Stark v. Weinberger*, 497 F.2d at 1100; (2) ultimate termination due to inability to satisfactorily perform the activity without assistance, *id.;* (3) special concessions made for the claimant such as fewer and easier duties, *Liebel v. Harris*, 493 F.Supp. at 134; (4) production and quality of claimant's work lower than that of other employees, *id.;* and (5) unusual assistance required of coworkers by claimant, *Chicager v. Califano*, 574 F.2d at 164.

There is uncontroverted evidence of record which overwhelmingly and conclusively demonstrates the existence of all of the above listed indicators in Musebeck's case. These indicators form the basis of substantial evidence that she was not, in fact, performing substantial gainful activity, but rather receiving a governmental subsidy during the critical period. She was therefore "disabled within the meaning of the Act notwithstanding the fact that she actually did work" during that period. *Stark v. Weinberger*, 497 F.2d at 1100. *See also Fowler v. Califano*, 596 F.2d 600, 603 (3d Cir.1979).

■ Moreover, in determining whether a claimant is no longer disabled the record as a whole must be considered. *See Morrone v. Secretary of Health, Education & Welfare*, 372 F.Supp. 794, 801 (E.D.Pa.1974) (Becker, J.). This is because isolated or sporadic work periods within a claimant's protracted disability may be indicative of his/her inability to engage in substantial gainful activity. *Id. See also Coulter v. Weinberger*, 527 F.2d 224, 229 (3d Cir. 1975).

The record as a whole in this case clearly and unambiguously supports a finding of Musebeck's continued disability. Her medical history before, during, and after the critical period unmistakably indicates the existence of a very severe mental impairment. The fact that this severe mental impairment precluded her from engaging in substantial gainful activity before, during and after the critical period is evidenced by her employment history. Thus, there is substantial evidence on the record as a whole that Musebeck was and continues to be disabled.

Because "[r]eversal with a direction to the Secretary to award benefits is particularly appropriate 'where the administrative record has been fully developed and substantial evidence on that record as a whole indicates that the claimant is disabled,'" *Walker v. Heckler*, No. 84–2653, slip op. at 7 (E.D.Pa. May 24, 1985) (quoting *Caffee v. Schweiker*, 752 F.2d 63, 68 (3d Cir.1985)), plaintiff's motion for summary judgment will be granted, defendant's cross motion will be denied, and the Secretary will be directed to pay plaintiff the SSI benefits due her.