[This opinion has been published in *Ohio Official Reports* at 73 Ohio St.3d 260.]

BUCHMAN, APPELLANT AND CROSS-APPELLEE, *v*. BOARD OF EDUCATION OF THE WAYNE TRACE LOCAL SCHOOL DISTRICT, APPELLEE AND CROSS-APPELLANT.

[Cite as *Buchman v. Wayne Trace Local School Dist. Bd. of Edn*., 1995-Ohio-136.]

*Political subdivisions—Torts—Limitations on damages—Social Security and Medicare benefits are collateral source benefits contemplated by R.C. 2744.05(B)—Future collateral benefits deductible from jury's verdict against a political subdivision, when—R.C. 2744.05(B) is constitutional—Burden is on political subdivision to prove extent to which it is entitled to an effset under R.C. 2744.05(B)—Political subdivision has right to discover collateral benefits at any time during pendency of an action against it, irrespective of admissibility issue—Political subdivision not denied all rights of setoff pursuant to R.C. 2744.05(B) for future Medicare Part A benefits on basis it failed to quantify exact amount of damages allocated by jury to future hospitalizations expenses, when.*

---

1. R.C. 2744.05(B) is constitutional.

2. Social Security and Medicare benefits are the type of collateral source benefits contemplated by R.C. 2744.05(B).

3. Pursuant to R.C. 2744.05(B), future collateral benefits, to the extent they can be determined with a reasonable degree of certainty, are deductible from the jury's verdict against a political subdivision.

4. Under R.C. 2744.05(B), a collateral benefit is deductible only to the extent that the loss for which it compensates is actually included in the jury's award.

5. It is the political subdivision's burden to prove the extent to which it is entitled to an offset under R.C. 2744.05(B).

6. A political subdivision has a legal right to discover collateral benefits at any time during the pendency of an action against it, irrespective of the issue of admissibility.

(No. 94-412—Submitted April 4, 1995—Decided August 23, 1995.)

APPEAL and CROSS-APPEAL from the Court of Appeals for Paulding County, No. 11-92-11.

———————————

{¶ 1} On September 1, 1989, appellant and cross-appellee, Donald A. Buchman, was driving his automobile south on State Route 127 in Paulding County. His wife Johanna and his two sons, Adam and Paul, were passengers in the car. At the same time, a school bus, empty of passengers, owned by appellee and cross-appellant, Board of Education of the Wayne Trace Local School District ("Wayne Trace"), was stopped at a stop sign controlling westbound traffic on County Road 60 where it intersects with State Route 127. As the Buchmans' vehicle approached the intersection, the school bus proceeded across State Route 127 and into the path of their vehicle. As a result of the collision, Donald suffered a C5-6 fracture, dislocation and a complete transection of his spinal cord, and was rendered a permanent level C4 quadriplegic.

{¶ 2} On November 20, 1989, the Buchmans filed a complaint against Wayne Trace in the Paulding County Court of Common Pleas. Prior to trial, the claims for the personal injuries of Johanna, Adam and Paul were settled, leaving for trial only a claim for personal injuries to Donald and Johanna's claim for loss of consortium.[1]

---

1. During the course of the proceedings in the Paulding County Court of Common Pleas, a number of parties were added who were responsible for the administration of an employee benefit plan under which Donald was potentially covered. The plan defendants caused the action to be removed to the United States District Court, Northern District of Ohio, Western Division (case No. 3:90CV7170).

{¶ 3} The case proceeded to a two-and-one-half week jury trial on July 20, 1992. The Buchmans proposed twenty-three jury interrogatories, fifteen of which itemized damages suffered by Donald. The latter fifteen interrogatories would have required the jury to apportion Donald's damages between past and future losses in various categories, including medical bills, home care expenses, home supplies and medication expenses, lost wages/lost earning capacity, loss of household services, and equipment costs. Included in these interrogatories were three proposed interrogatories which sought a single sum for Donald's past and future pain and suffering, home modifications and college expenses, respectively.

{¶ 4} The interrogatories proposed by Wayne Trace concerning Donald's damages sought a total monetary figure representing the amount of damages which would fully and fairly compensate Donald, categorized only according to economic and noneconomic damages. It was Wayne Trace's position that "[t]here should be no further breakdown other than that from a total amount."

{¶ 5} The trial court rejected Buchmans' proposed interrogatories with respect to Donald's damages, on the basis that "[t]o break those down into individual elements *** as the Plaintiffs are requesting *** is not necessary *** [and] is really [not] a determinative issue as [Civ.R.] 49 envisions." Instead, the trial court submitted its own interrogatories categorizing Donald's damages according to past economic losses, future economic losses, and noneconomic damages, which the court believed provided the breakdown necessary for the post-verdict hearing to reduce the verdict by the amount of benefits received from collateral sources pursuant to R.C. 2744.05(B).

---

The district court granted summary judgment in favor of the plan defendants and against Buchman, and remanded the case to the Paulding County Common Pleas Court. Wayne Trace, a third-party plaintiff in the federal proceedings, filed an appeal to the Sixth Circuit Court of Appeals (case No. 91-3931) but subsequently moved for, and was granted, a voluntary dismissal of that appeal. Thereafter, the cause proceeded in the common pleas court on Donald's personal-injury claim and Johanna's loss-of-consortium claim against Wayne Trace.

**{¶ 6}** The jury found Wayne Trace to be one-hundred percent negligent, awarded $5,082,482 to Donald, and provided the following relevant answers to the interrogatories submitted:

"*INTERROGATORY NO. 5*

"WHAT IS THE TOTAL AMOUNT OF MONEY DAMAGES THAT WILL FULLY AND FAIRLY COMPENSATE DONALD BUCHMAN FOR HIS *PAST* MEDICAL BILLS, HOME AIDE CARE EXPENSES, EXPENSES FOR MEDICATION AND SUPPLIES USED AT HOME, LOST WAGES, LOST HOUSEHOLD SERVICES, AND EQUIPMENT COSTS?

"(In answering this question you will totally disregard whether or not Donald Buchman had any fault.)

"$947,684.00"

"*INTERROGATORY NO. 6*

"WHAT IS THE TOTAL AMOUNT OF MONEY DAMAGES THAT WILL FULLY AND FAIRLY COMPENSATE DONALD BUCHMAN FOR HIS *FUTURE* MEDICAL BILLS, HOME AIDE CARE EXPENSES, EXPENSES FOR MEDICATIONS AND SUPPLIES USED AT HOME, EQUIPMENT NEEDS, LOST EARNINGS AND LOST EARNING CAPACITY, LOST HOUSEHOLD SERVICES, HOME MODIFICATIONS AND REMODELING EXPENSES, AND COLLEGE TUITION, BOOKS AND SUPPLIES[?]

"(In answering this question you will totally disregard whether or not Donald Buchman had any fault.)

"$3,884,798.00"

"*INTERROGATORY NO. 7*

"WHAT IS THE TOTAL AMOUNT OF MONEY DAMAGES THAT WILL FULLY AND FAIRLY COMPENSATE DONALD BUCHMAN FOR HIS PAST AND FUTURE PAIN AND SUFFERING (PHYSICAL PAIN, PHYSICAL IMPAIRMENT, LOSS OF ENJOYMENT OF LIFE, PERMANENT INJURIES,

INABILITY TO PERFORM USUAL ACTIVITIES, INCREASED RISK OF FUTURE COMPLICATIONS AND ILLNESS, ANXIETY, MENTAL ANGUISH, EMOTIONAL STRESS, ETC.)?

"(In answering this question you will totally disregard whether or not Donald Buchman had any fault.)

"$250,000.00"

{¶ 7} On August 21, 1992, the trial court held a post-verdict hearing to determine the appropriate collateral source deductions to be made under R.C. 2744.05(B). Despite repeated expressions of trepidation over its ability to apply the statute to offset future collateral benefits, the trial court nevertheless settled on the following deductions from Donald's award:

| | |
|---|---|
| "Undisputed collateral benefits | 62,887.82 |
| "Medicare payment of future medical (non-hospital) expenses | 18,077.93 |
| "Medicare payment of future hospitalization expenses | 1,296,945.42 |
| "Social Security disability benefits | 281,324.00 |
| **Total** | $1,659,235.17" |

{¶ 8} Accordingly, the trial court entered judgment in favor of Donald in the amount of $3,423,246.83.

{¶ 9} The court of appeals reversed, finding many of the trial court's calculations speculative. In addition, the court of appeals found that "the interrogatories submitted to the jury were inadequate to permit determination of the specific losses for which the jury awarded compensation, thus compelling the trial court to speculate when calculating collateral benefit deductions." The court of appeals also held that Social Security payments to Donald's children were not in any event deductible benefits pursuant to R.C. 2744.05(B). The court of appeals, however, did not perform any calculations of its own or order that speculative

deductions be added back into the verdict. Instead, it remanded the cause "for retrial to determine damages of each category [of loss]."

{¶ 10} This cause is now before the court upon the allowance of a motion and cross-motion to certify the record.

_____

*Gretick, Bish, Lowe & Roth* and *Craig L. Roth*, for appellant and cross-appellee.

*Clemens, Korhn & Liming, John M. Liming* and *Stephen F. Korhn*, for appellee and cross-appellant.

*Mark W. Ruf*, urging reversal for *amicus curiae*, Ohio Academy of Trial Lawyers.

*Means, Bichimer, Burkholder & Baker Co., L.P.A.,* and *Kimball H. Carey,* urging affirmance for *amicus curiae*, Ohio School Boards Association.

*Malcolm C. Douglas* and *John E. Gotherman*, urging affirmance for *amici curiae*, Ohio Municipal League, Ohio Municipal League Joint Self-Insurance Pool and County Commissioners Association of Ohio.

_____

**ALICE ROBIE RESNICK, J.**

{¶ 11} Except for a single proposition of law raised by the cross-appeal concerning the use of a party-opponent's videotaped deposition, these appeals relate solely to the validity, construction, and application of R.C. 2744.05(B). The issues raised thereby can be grouped under two broad categories: one involving the constitutionality of R.C. 2744.05(B), and the other involving its operability. Although the constitutionality of R.C. 2744.05(B) is challenged under several provisions of the Ohio Constitution, particularly Sections 2, 5 and 16, Article I, the common basis for the challenge is that the statute unconstitutionally provides for the deduction of collateral benefits irrespective of whether such benefits are actually duplicated in the jury's verdict.

**{¶ 12}** The issues concerning the operability of R.C. 2744.05(B) are: (1) whether Social Security and/or Medicare benefits are deductible; (2) whether and under what circumstances future benefits are deductible; (3) whether collateral benefits may be deducted irrespective of whether such benefits are actually duplicated in the jury's verdict; and (4) several related procedural issues.

I

Collateral Benefit Deductions under R.C. 2744.05(B)

A

Social Security and Medicare

**{¶ 13}** R.C. 2744.05(B) provides in pertinent part that:

"If a claimant receives or is entitled to receive benefits for injuries or loss allegedly incurred from a policy or policies of insurance or any other source, the benefits shall be disclosed to the court, and the amount of the benefits shall be deducted from any award against a political subdivision recovered by that claimant. No insurer or other person is entitled to bring an action under a subrogation provision in an insurance or other contract against a political subdivision with respect to such benefits."

**{¶ 14}** In *Vogel v. Wells* (1991), 57 Ohio St.3d 91, 566 N.E.2d 154, we defined a "benefit" as "'[f]inancial assistance received in time of sickness, disability, unemployment, etc. either from insurance or public programs such as social security.'" Id. at 98, 566 N.E.2d at 161, quoting from Black's Law Dictionary (6 Ed.1990) 158.

**{¶ 15}** Recently, in *Galanos v. Cleveland* (1994), 70 Ohio St.3d 220, 222, 638 N.E.2d 530, 532, we were "persuaded that Medicaid benefits are the type of collateral source benefits contemplated by R.C. 2744.05(B)" because Medicaid "is a benefit received as part of a public program." Previously, however, in *Hodge v. Middletown Hosp. Assn.* (1991), 62 Ohio St.3d 236, 239-240, 581 N.E.2d 529, 532, we drew a distinction between Medicaid and Medicare Part A benefits under R.C.

2305.27, for the purpose of reducing medical malpractice damage awards. The distinction was drawn because R.C. 2305.27, unlike R.C. 2744.05(B), draws a distinction between collateral benefits on the basis of who pays the premiums or underwrites the cost of the program. Such a distinction is, therefore, irrelevant under R.C. 2744.05(B). See *Lamb v. Quincy* (1993), 92 Ohio App.3d 592, 636 N.E.2d 412 (Medicare payments deductible under R.C. 2744.05[B]).

{¶ 16} Accordingly, we hold that Social Security and Medicare benefits are the type of collateral source benefits contemplated by R.C. 2744.05(B).

{¶ 17} The Social Security benefits which Donald's children have received or are entitled to receive, however, are not deductible from the jury's verdict. No part of the $5,082,482 verdict against which Wayne Trace seeks to offset these benefits was awarded to Donald's children. Moreover, these benefits, as explained by John Stevenson, Northwest Ohio District Manager for the Social Security Administration, during the post-verdict hearing, "are for the care and welfare and use of the children." R.C. 2744.05(B) expressly provides that "[i]f a *claimant* receives or is entitled to receive [collateral] benefits ***, the amount of the benefits shall be deducted from any award *** *recovered by that claimant*." (Emphasis added.) Thus, any Social Security payments to Donald's children are not deductible in this case pursuant to R.C. 2744.05(B).

{¶ 18} Accordingly, the judgment of the court of appeals is affirmed as to these issues.

B

Future Benefits

{¶ 19} The collateral benefits to be deducted under R.C. 2744.05(B) are those benefits that a claimant receives "or is entitled to receive." Buchman argues that "[c]areful statutory examination reveals that the legislature did not intend R.C. 2744.05(B) to apply to future collateral benefits." Buchman points to several other provisions in the Revised Code in which the General Assembly has employed

8

language expressive of a time distinction when describing losses, damages, or benefits. R.C. 2744.05(C)(2)(a) and (c), 2744.06(B)(1)(a)(i) and (b)(i) and (ii), and 2317.45(A)(1)(a). Buchman concludes that the General Assembly's failure to employ express future-tense language in R.C. 2744.05(B) means that "the legislature intentionally excluded future collateral benefits from R.C. {2744.05(B)."

{¶ 20} A review of the various provisions on which Buchman relies reveals only that legislative intent cannot necessarily be determined from the General Assembly's failure to use time-distinctive language in R.C. 2744.05(B). The legislative history of R.C. 2744.05(B) does not suggest that language was formerly included which expressly provided for deductions for future collateral benefits and thereafter removed. The General Assembly's use of time-distinctive language in other provisions is not limited to designating the inclusion of future damages, losses, or benefits. On occasion, the General Assembly has utilized time-distinctive language to expressly limit damages to those losses incurred as of the date of judgment, and to expressly exclude future losses. See R.C. 2744.06(B)(1)(a)(i) and (b)(i) and (ii). Applying Buchman's logic to these provisions, it could be argued that since R.C. 2744.05(B) fails to expressly limit collateral benefits to those already received, the General Assembly must have intentionally included future collateral benefits within the contemplation of R.C. 2744.05(B).

{¶ 21} Instead, legislative intent regarding the inclusion or exclusion of future collateral benefits under R.C. 2744.05(B) must be deciphered in light of the purpose and design of R.C. 2744.05. "The statute serves two purposes. It conserves fiscal resources of political subdivisions by limiting their tort liability. Secondly, it permits injured persons, who have no source of reimbursement for their damages, to recover for a tort committed by the political subdivisions." *Menefee v. Queen City Metro* (1990), 49 Ohio St.3d 27, 29, 550 N.E.2d 181, 182. In particular, R.C. 2744.05 allows recovery for certain relevant future losses while reducing the net

liability of the political subdivision to that exceeding the claimant's collateral sources. R.C. 2744.05(B) and (C).

{¶ 22} It would clearly contravene the design of the statute to permit recovery of future losses from a political subdivision without allowing an offset for corresponding future collateral benefits.

{¶ 23} In *Morris v. Savoy* (1991), 61 Ohio St.3d 684, 693, 576 N.E.2d 765, 773, we held R.C. 2305.27 applicable to future collateral payments. In so doing, we stated that future collateral payments are deductible "to the extent they can be determined with a reasonable degree of certainty."

{¶ 24} Accordingly, we hold that pursuant to R.C. 2744.05(B), future collateral benefits, to the extent they can be determined with a reasonable degree of certainty, are deductible from the jury's verdict against a political subdivision, and the judgment of the court of appeals is affirmed as to this issue.

C

Matching

{¶ 25} The issue here is whether R.C. 2744.05(B) authorizes the trial court to deduct the total of all collateral benefits from the general verdict, irrespective of whether the collateral benefits were actually duplicated in the jury's verdict, or whether collateral benefits can only be deducted to the extent that they can be matched to a corresponding component of the jury's verdict. This is a question of statutory construction. The question of the statute's constitutional viability, however, comes into play depending on how we resolve this issue of construction. In turn, we must construe R.C. 2744.05(B), to the extent reasonably possible, to require the aforementioned matching in order to permit the statute to operate lawfully and constitutionally. In this regard, the issues of R.C. 2744.05(B)'s constitutionality and operability are inextricably intertwined and must be considered together.

**{¶ 26}** In *Menefee, supra*, at the syllabus, we held that "R.C. 2744.05(B) is a constitutional exercise of legislative authority under the Equal Protection Clauses of the United States and Ohio Constitutions." In so holding, we identified the state's "valid interest in preserving the financial soundness of its political subdivisions," and found that "a rational basis can be conceived to justify a classification in which subrogation claims are treated differently from other claims against a political subdivision." *Id.*, 49 Ohio St.3d at 29, 550 N.E.2d at 183.

**{¶ 27}** Our analysis in *Menefee* reflected a two-step process, whereby the court is first required to identify a valid state interest and then required to determine whether the method or means by which the state has chosen to advance that interest is rational. See *Schweiker v. Wilson* (1981), 450 U.S. 221, 226, 101 S.Ct. 1074, 1079, 67 L.Ed.2d 186, 193; *United States RR. Retirement Bd. v. Fritz* (1980), 449 U.S. 166, 177, 101 S.Ct. 453, 460, 66 L.Ed.2d 368, 377-378. No determination was made in *Menefee* as to whether the state may rationally advance its interest in preserving the financial soundness of its political subdivisions by allowing a trial court to deduct collateral benefits from the jury's verdict, irrespective of whether such benefits are duplicated in the jury's verdict. In other words, we determined in *Menefee* that the *second sentence* of R.C. 2744.05(B) is not irrational or arbitrary, but made no such determination regarding the *first sentence* of R.C. 2744.05(B). Moreover, the holding in *Menefee* is limited to Section 2, Article I of the Ohio Constitution. In this case additional challenges are made to the constitutional viability of R.C. 2744.05(B) under Sections 5 and 16, Article I of the Ohio Constitution.

**{¶ 28}** In *Sorrell v. Thevenir* (1994), 69 Ohio St.3d 415, 633 N.E.2d 504, we considered the constitutionality of R.C. 2317.45 (Am.Sub.H.B. No. 1, 142 Ohio Laws, Part I, 1661, 1694) under Sections 2, 5 and 16, Article I of the Ohio Constitution. We held R.C. 2317.45, which was enacted as part of the Tort Reform Act of 1987 and provided for collateral benefit deductions in tort actions, to be

violative of each of the aforementioned constitutional provisions. In so holding, we found two constitutional infirmities, one concerning the validity of the state's interest, and the other concerning the means employed in the statute to attain its goal.

{¶ 29} We noted that the purpose of the Act, as stated in its title, was premised on "'reducing the causes of the current insurance crisis.'" *Id*. at 420, 633 N.E.2d at 509. We doubted the validity of this goal "given the paucity of credible empirical evidence that a crisis existed." *Id.* at 423, 633 N.E.2d at 511.

{¶ 30} In addition, we found that even if the goals of R.C. 2317.45 were valid, "the means employed in the statute to attain the goal are both irrational and arbitrary. Of primary significance is that the statute requires deductions from jury verdicts irrespective of whether a collateral benefit defined in R.C. 2317.45(A)(1) is actually included in the verdict. *** R.C. 2317.45 fails to take into account whether the collateral benefits to be deducted are within the damages actually found by the jury ***. Thus, the statute can arbitrarily reduce damages that a jury awards a plaintiff, since under the statute it is irrelevant whether any collateral benefit actually represents any portion of the jury's award." *Id*. at 423-424, 633 N.E.2d at 511. This rationale formed the essential basis upon which we held R.C. 2317.45 to be unconstitutional under each of the aforementioned constitutional provisions.

{¶ 31} In between the time of the decisions in *Menefee, supra*, and *Sorrell, supra*, we decided *Morris, supra*. In *Morris*, the majority held that R.C. 2305.27, the collateral source setoff provision in medical malpractice cases, is constitutional. In so holding, the majority reasoned that "[w]hile it is not clearly apparent that there is a substantial relationship between the setoff and malpractice insurance rates, it does not appear to be unreasonable or arbitrary to deny a *double* recovery." (Emphasis *sic*.) *Id.* at 693, 576 N.E.2d at 772. The majority was careful, however, to construe the statute to require that future workers' compensation benefits "be deducted from the jury's verdict *for future lost wages*." (Emphasis added.) Id. at

693, 576 N.E.2d at 773. Although the viability of the holding in *Morris* is questionable on other grounds,[2] it is significant that the majority in *Morris* was compelled to require matching in order to achieve rationality under R.C. 2305.27.

{¶ 32} Unlike the perceived insurance "crisis" advanced in support of R.C. 2317.45, and the perceived medical care "crisis" advanced in *Morris,* the state's interest in preserving the financial soundness of its political subdivisions advanced in support of R.C 2744.05(B) is clearly valid. *Menefee, supra*, at 29, 550 N.E.2d at 183. Nevertheless, the means by which the state advances its interest must be rational. Although *Morris* and *Sorrell* evince a certain amount of tension on the court over the viability of collateral benefit offset statutes, the one inexorable source of agreement seems to be that there shall be no constitutionality without a requirement that deductible benefits be matched to those losses actually awarded by the jury.

{¶ 33} R.C. 2744.05(B), unlike R.C. 2317.45, does not foreclose a construction requiring that a collateral benefit be matched to a component of the jury's verdict before it can be deducted. Thus, we are required to adopt such a

---

2. The holding in *Morris* is questionable for two reasons, both articulated by Justice A. William Sweeney, in his dissent in *Morris*, and both of which were later adopted by the majority of the court. First, Justice Sweeney pointed out that "limiting double recovery in medical malpractice cases *** is not *necessary* to promote a *compelling* governmental interest particularly where, as here, the statutory classification is established in response to a 'crisis' which is yet to be shown to exist." (Emphasis *sic*). Id. at 711, 576 N.E.2d at 784 (Sweeney, J., dissenting). This reasoning was adopted in *Sorrell, supra*, at 425, 633 N.E.2d at 512, where a majority of the court further explained that "[i]n *Morris, supra*, the majority upheld the constitutionality of R.C. 2305.27 in setting off medical malpractice collateral benefits. However, the validity of that holding is questionable at best given our resolution of the causes *sub judice*."

Second, Justice Sweeney pointed out in his dissent in *Morris* that under the particular language of R.C. 2305.27, workers' compensation benefits should not have been set off against the medical malpractice award. *Id.* at 713, 576 N.E.2d at 786. R.C. 2305.27 contains specific language precluding a setoff for collateral payments made pursuant to an insurance policy or contract for which the beneficiary or his employer pays premiums or underwrites the cost. In *Savage v. Correlated Health Serv., Ltd*. (1992), 64 Ohio St.3d 42, 591 N.E.2d 1216, a majority of the court adopted Justice Sweeney's assessment in *Morris* and held that "workers' compensation and Social Security benefits fall under the definition of 'insurance' in R.C. 2305.27, and therefore do not reduce medical malpractice damage awards." *Id.* at 48-49, 591 N.E.2d at 1220-1221.

construction in order to permit the statute to operate lawfully and constitutionally. It is a well-established rule that a court must, to the extent reasonably possible, construe a statute so as to permit it to operate lawfully and constitutionally. *Schneider v. Laffoon* (1965), 4 Ohio St.2d 89, 97, 33 O.O.2d 468, 472, 212 N.E.2d 801, 806. A court is bound to give a constitutional rather than an unconstitutional construction to a statute. *United Air Lines v. Porterfield* (1971), 28 Ohio St.2d 97, 100, 57 O.O.2d 288, 290, 276 N.E.2d 629, 632. Thus, where a statute reasonably allows for more than a single construction or interpretation, it is the duty of the court to choose that construction or interpretation which will avoid rather than raise serious questions as to its constitutionality. *Cincinnati v. De Golyer* (1971), 25 Ohio St.2d 101, 106, 54 O.O.2d 232, 234, 267 N.E.2d 282, 285; *Co-operative Legislative Commt. v. Pub. Util. Comm.* (1964), 177 Ohio St. 101, 29 O.O.2d 266, 202 N.E.2d 699, paragraph two of the syllabus. Only where the posture of a cause leaves no logical alternative will courts declare legislation unconstitutional. *Bedford Hts. v. Tallarico* (1971), 25 Ohio St.2d 211, 212, 54 O.O.2d 321, 267 N.E.2d 802, 803.

{¶ 34} Accordingly, we hold that under R.C. 2744.05(B), a collateral benefit is deductible only to the extent that the loss for which it compensates is actually included in the jury's award. Thus, R.C. 2744.05(B) is constitutional, and the judgment of the court of appeals is affirmed as to these issues.

D

Procedural Issues

**{¶ 35}** The primary issue here is whether the court of appeals erred in remanding the cause for a new trial on the issue of damages in order that more detailed interrogatories may be submitted to the jury.

**{¶ 36}** R.C. 2744.05(B) "abrogates the collateral source rule as to municipalities." *Vogel, supra*, 57 Ohio St.3d at 97, 566 N.E.2d at 160. It does not, however, abrogate that aspect of the collateral source rule which provides that the "receipt of [collateral] benefits is not to be admitted in evidence, or otherwise disclosed to the jury." *Pryor v. Webber* (1970), 23 Ohio St.2d 104, 109, 52 O.O.2d 395, 397, 263 N.E.2d 235, 239. Instead, R.C. 2744.05(B) provides for a post-verdict proceeding in which collateral "benefits shall be disclosed to the court, and the amount of the benefits shall be deducted from any award ***."

**{¶ 37}** Properly construed, R.C. 2744.05(B) places the burden of disclosure upon the plaintiff. The issue of disclosure, however, is separate and distinct from the issue of the defendant's entitlement to an offset under R.C. 2744.05(B). As we held *supra,* a political subdivision is entitled to an offset for collateral benefits only to the extent that such benefits are actually included in the jury's award, and is entitled to an offset for future collateral benefits only to the extent that they can be determined with a reasonable degree of certainty. Thus, it is the defendant's burden to prove the extent to which it is entitled to an offset under R.C. 2744.05(B). Cf. *Reilly v. United States* (C.A.1, 1988), 863 F.2d 149, 163; *Rudolf v. Iowa Methodist Med. Ctr.* (Iowa 1980), 293 N.W.2d 550, 559-560. Otherwise, the statute could operate to arbitrarily reduce the damages that a jury awards a plaintiff by allowing deductions for collateral benefits that are not included in the jury's award, or that are not reasonably certain to be received.

**{¶ 38}** Although R.C. 2744.05(B) does not require the submission of jury interrogatories to quantify the categories of damages that make up the general

verdict, as a practical matter, such interrogatories are the most efficient and effective method, if not the only method, by which to determine whether the collateral benefits to be deducted are within the damages actually found by the jury. See *Sorrell, supra*, 69 Ohio St.3d at 424, 633 N.E.2d at 511. To the extent that the failure to propose such interrogatories caused the trial court to speculate as to the amount of benefits to be deducted from the jury's verdict, Wayne Trace simply failed in its burden of proof.

**{¶ 39}** Moreover, in the case *sub judice*, it was Buchman who actually proposed the interrogatories that would have quantified the categories of damages that made up the jury's verdict. Those interrogatories sought an allocation between, among other things, past and future lost wages as well as between past and future hospital expenses; the very categories against which Social Security and Medicare benefits must be offset. Wayne Trace, however, proposed interrogatories which would have categorized the jury's verdict only according to economic and noneconomic damages, asserting that "[t]here should be no further breakdown other than that from a total amount." As this court explained in *State v. Kollar* (1915), 93 Ohio St. 89, 91, 112 N.E. 196, 197:

"The law imposes upon every litigant the duty of vigilance in the trial of a case, and even where the trial court commits an error to his prejudice, he is required then and there to challenge the attention of the court to that error, by excepting thereto, and upon failure of the court to correct the same to cause his exceptions to be noted.

"It follows, therefore, that, for much graver reasons, a litigant cannot be permitted, either intentionally or unintentionally, to induce or mislead a court into the commission of an error and then procure a reversal of the judgment for an error for which he was actively responsible."

**{¶ 40}** Wayne Trace argues, however, that even if it did have a burden to prove its entitlement to an offset under R.C. 2744.05(B), it was Buchman who made

it impossible for the trial court or Wayne Trace to submit sufficient jury interrogatories by failing to disclose the possible existence of Medicare benefits prior to the submission of the case to the jury. Further, Wayne Trace postulates that it has no right to discover the existence of collateral benefits prior to trial and, therefore, lacks the means to acquire the knowledge to enable it to draft the necessary interrogatories.

{¶ 41} Wayne Trace's argument rests upon the unstated assertion that had it known, or had the means to know, that Buchman would be eligible for Medicare benefits, it would have proposed (or at least not opposed) an interrogatory quantifying the amount of damages allocated to future hospitalization expenses. This assertion, however, is belied by Wayne Trace's position at trial, that there should be no further breakdown of damages from a total amount other than that between economic and noneconomic damages. This position is underscored by the fact that Wayne Trace, who admits in its merit brief that it was fully aware of Buchman's entitlement to Social Security benefits, nevertheless opposed a breakdown of jury damages between past and future lost wages and between lost wages and other economic damages.

{¶ 42} Moreover, we reject Wayne Trace's explanation of why it failed to seek discovery regarding collateral benefits. Wayne Trace explains that "[a] motion for discovery of collateral benefits would, undoubtedly, have been met with an objection, since there is no legal basis for discovery by a defendant of collateral benefits and such evidence would have been inadmissible at trial. Hence, such a motion would have been a 'vain thing.'"

{¶ 43} The fact that R.C. 2744.05(B) fails to create an independent and separate legal basis for discovery regarding matters of collateral source benefits, does not preclude Wayne Trace from resorting to the general discovery provisions of the Civil Rules to obtain such information. See *Corter v. Luck* (1978), 410 N.Y.S.2d 249, 96 Misc.2d 960. Wayne Trace could have obtained discovery

pursuant to Civ.R. 26(B)(1).[3] The issue of collateral benefits is particularly relevant to the pending action in light of the commands of R.C. 2744.05(B). Also, collateral benefits clearly relate to the defense of a party, given that Wayne Trace alleged, as its third defense in its answer to the Buchmans' second amended complaint, that it is entitled "to all Ohio Revised Code Chapter 2744 limits on damages, setoff rights, and other relief." Nor would it be grounds for objection under Civ.R. 26(B)(1) that collateral benefits will be inadmissible at trial. See *Hughes v. Groves* (W.D.Mo.1969), 47 F.R.D. 52, 56. See, also, 4 Moore's Federal Practice (1994) 26-147, fn. 79, Section 26.07[1]; Annotation (1989), 74 A.L.R.4th 32, 76-77, Section 24. Pursuant to R.C. 2744.05(B), a political subdivision becomes the ultimate beneficiary of a claimant's collateral source benefits. Further, it would seem that the discovery of collateral benefits is indispensable in any serious pretrial settlement negotiations between a political subdivision and the plaintiff. Accordingly, a political subdivision has a legal right to discover such benefits at any time during the pendency of an action against it, irrespective of the issue of admissibility.

{¶ 44} Thus, we hold that the court of appeals erred in ordering a new trial on the issue of damages in order that more detailed interrogatories may be submitted to the jury, and the judgment of the court of appeals is reversed as to this issue.

---

3. Civ.R. 26(B)(1) provides:
    "*In General*. Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party, including the existence, description, nature, custody, condition and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter. It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence."

E

Application

{¶ 45} We now turn our attention to determining the extent to which the record, as it stands, supports future collateral source deductions for Social Security and/or Medicare benefits under R.C. 2744.05(B).

1

Social Security Deductions

{¶ 46} The trial court's Social Security benefit deductions were calculated on the basis that the payments to Donald's children are deductible pursuant to R.C. 2744.05(B). Since we have determined, *supra*, that the payments to Donald's children are not deductible pursuant to R.C. 2744.05(B), we need only concern ourselves with the Social Security benefits to which Donald is entitled.

{¶ 47} Stevenson testified that Donald's eligibility for Social Security benefits began in February 1990 in the amount of $914.80 a month. In December 1991, the amount was raised to $967 a month. However, any additional increases are "anybody's guess." Thus, the deductible amount of Social Security benefits between February 1990 and December 1991 is $20,125.60 ($914.80 per month times twenty-two months).

{¶ 48} Beginning December 1991, Donald was entitled to $967 per month. The question remaining is the length of time it is reasonably certain for Donald to receive such benefits.

{¶ 49} Donald's eligibility for Social Security benefits is a result of a determination that his condition is "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy ***." Section 423(d)(2)(A), Title 42, U.S.Code. See, also, Sections 423(a)(1)(D) and (d)(1)(A), Title 42, U.S.Code.

**{¶ 50}** Donald's benefits will be terminated, however, regardless of his medical condition, age, education and work experience, if and when he becomes engaged in substantial gainful activity. Section 423(f), Title 42, U.S.Code; Section 404.1520(b), Title 20, C.F.R. See, also, *Katz v. Secy. of Health & Human Serv.* (C.A.9, 1992), 972 F.2d 290, 293; *Fowler v. Bowen* (C.A.10, 1989), 876 F.2d 1451, 1453. "Substantial gainful activity is work activity that is both substantial and gainful." Section 404.1572, Title 20, C.F.R. Work activity is substantial if it "involves doing significant physical or mental activities *** even if it is done on a part-time basis ***." Section 404.1572(a), Title 20, C.F.R. Work activity is gainful if it is done "for pay or profit *** [or] is the kind of work usually done for pay or profit, whether or not a profit is realized." Section 404.1572(b), Title 20, C.F.R.

**{¶ 51}** Several factors are considered in determining whether an individual has the skills and ability to work at a substantial gainful activity level, including the nature of the work, the performance level, the existence of special conditions, and the time spent at work. Section 404.1573, Title 20, C.F.R. In addition, the Social Security Administration uses certain guides when the applicant is an employee. "Generally, if you worked for substantial earnings, this will show you that you are able to do substantial gainful activity. On the other hand, the fact that your earnings are not substantial will not necessarily show that you are not able to do substantial gainful activity." Section 404.1574(a)(1), Title 20, C.F.R.

**{¶ 52}** Specifically, the regulations provide that certain levels of earnings will ordinarily show that an applicant has or has not engaged in substantial gainful activity. If an individual's earnings from work averaged more than $500 a month in calendar years after 1989, such work will ordinarily be considered substantial gainful activity. Section 404.1574(b)(2)(vii), Title 20, C.F.R. If an individual's earnings averaged less than $300 a month in calendar years after 1989, such work will ordinarily not be considered substantial gainful activity. Section 404.1574(b)(3)(vii), Title 20, C.F.R. These earnings guidelines operate in the

nature of a presumption. See *Katz, supra*, at 293; *Keyes v. Sullivan* (C.A.9, 1990), 894 F.2d 1053, 1056; *Mullis v. Bowen* (C.A.6, 1988), 861 F.2d 991, 993; *Hedge v. Richardson* (C.A.10, 1972), 458 F.2d 1065, 1067-1068; *Musebeck v. Heckler* (D.C.Pa.1985), 614 F.Supp. 1086, 1090; *Crites v. Weinberger* (D.C.Tex.1973), 364 F.Supp. 956, 959-960.

{¶ 53} The evidence in this case suggests that Donald will be capable of engaging in substantial gainful employment beginning in 1998. Prior to his injury, Donald had attended Ohio Northern University for approximately two years. Subsequent to his injury, in the summer of 1991, Donald enrolled as a student at Defiance College. Between that time and the time of trial, Donald completed four courses and had "gotten straight A's." He is presently a junior in college.

{¶ 54} Donald has definite plans of completing college, becoming a social worker and working at a hospital or physical rehabilitation facility. At the time of trial, he was already vice-president of a spinal cord injury group which was attempting to become associated with the National Spinal Cord Association.

{¶ 55} The medical and vocational experts overwhelmingly agreed that Donald is very motivated, extremely intelligent, and has the capability of completing his education sometime between 1996 and 1998 and becoming a social worker which, in 1996, would carry a starting salary of $25,000 per year.

{¶ 56} The trial court, however, declined to limit collateral benefit setoffs to the period of time prior to Donald's anticipated return to work, on the basis of former Section 423(d)(4), Title 42, U.S.Code, which provided, in relevant part, as follows:

"In determining whether an individual is able to engage in substantial gainful activity by reason of his earnings, where his disability is sufficiently severe to result in a functional limitation requiring assistance in order for him to work, there shall be excluded from such earnings an amount equal to the cost (to such individual) of any attendant care services, medical devices, equipment, prostheses,

and similar items and services (not including routine drugs or routine medical services unless such drugs or services are necessary for the control of the disabling condition) which are necessary (as determined by the Secretary in regulations) for that purpose, whether or not such assistance is also needed to enable him to carry out his normal daily functions; except that the amounts to be excluded shall be subject to such reasonable limits as the Secretary may prescribe."

{¶ 57} The trial court opined that "if Donald Buchman does return to employment (which certainly should be encouraged) the cost of attendant care services, medical devices, equipment, prostheses, and similar items and services necessary to enable him to return to employment will certainly exceed his potential earnings and not disqualify him from any future Social Security disability benefits or Medicare benefits."

{¶ 58} The record, however, affords an insufficient basis for drawing such a conclusion. The evidence presented both at trial and during the post-verdict collateral benefits hearing is insufficient to permit a determination as to the amount of impairment-related work expenses that would be subtracted from Donald's earnings under the conditions and limitations set forth in Section 404.1576, Title 20, C.F.R. In fact, Stevenson testified that if Donald reaches a point where he can perform the job of a social worker on a substantial basis, then his Social Security disability benefits would cease, following a nine-month trial work period (plus two additional months); and that he is not aware of people who are making $20,000 a year on a regular basis who are drawing Social Security disability benefits.

{¶ 59} Thus, it cannot be found, to a reasonable degree of certainty, that Donald will receive Social Security benefits beyond 1998. Accordingly, Wayne Trace is entitled to a setoff for Social Security benefits from December 1991 in the

amount of $81,228 ($967 per month times eighty-four months), for a total Social Security setoff of $101,353.60.[4]

## 2

## Future Medicare Deductions

{¶ 60} In order to make a determination as to the amount of Medicare Part A benefits to be deducted from the jury's verdict pursuant to R.C. 2744.05(B), the trial court needed to know the amount that the jury awarded Donald for future hospitalizations and the amount that would be paid by Medicare. The interrogatories submitted to the jury, however, failed to separately quantify the amount of damages allocated for future hospitalizations. Thus, the trial court was forced to make an attempt at determining the extent to which the jury awarded damages for Donald's future hospital costs.

{¶ 61} The trial court made two sets of findings. First, it found that the jury awarded future hospital damages to Donald on the basis that Donald would be hospitalized an average of thirty days per year at an average cost of $2,751 per day over a fifteen-year life expectancy period.

{¶ 62} Second, the trial court attempted mathematically to isolate that portion of the jury's verdict attributable to future hospital costs. The court purportedly accomplished this by subtracting various amounts of nonhospital future damages from the $3,884,798 awarded by the jury under Interrogatory No. 6. Initially, the court segregated the various damage components comprising Interrogatory No. 6 into future losses that are independent of life expectancy and those that are dependent upon life expectancy. The court identified the former as "future lost earnings, future lost household services that would have been performed by Donald Buchman, and future college expenses."

---

4. It is clear from the record that regardless of what evidence the jury relied upon, the minimum amount that was awarded for Donald's total lost wages exceeds $101,353.60.

**{¶ 63}** The trial court observed that "[i]n closing argument, counsel for plaintiffs argued that these future losses that were independent of life expectancy totaled $1,175,270.00." Subtracting this amount from the $3,884,798 awarded under Interrogatory No. 6, the trial court concluded that the remaining $2,709,528 is the amount the jury awarded Donald for his future damages that are dependent upon life expectancy.

**{¶ 64}** Next, the trial court subtracted three categories of future nonhospitalization damages that are dependent upon Donald's life expectancy. In computing these amounts, the court essentially multiplied by sixty percent the projections made for each respective category by the Buchmans' economist, Dr. Harvey Rosen, over a twenty-five-year life expectancy. Thus, the trial court subtracted $86,448 for future nonhospital medical expenses, $1,170,790.80 for future home health care (apparently computed on the basis of $8.50 per hour, twenty-four hours a day), and $134,516.40 for future equipment expenses.

**{¶ 65}** The trial court opined that the amount that remained after subtracting these nonhospitalization damages, *i.e.*, $1,317,772.80, must represent the amount awarded by the jury "for the cost of future hospitalizations over the next 15 years." The court reasoned that "the similarity between these figures and the result obtained when you calculate the cost of 30 days hospitalization at $2,751.00 per day for 15 years (30 days x $2,751.00/day x 15 yrs. = $1,237,950.00) is more than coincidental."

**{¶ 66}** The trial court then found that Medicare will pay all future hospitalization expenses over the next fifteen years, after Donald satisfies a $652 deductible per period of hospitalization. The court assumed, per the suggestion of Wayne Trace, that the thirty days of hospitalization per year would fall into two deductible periods, thus requiring Donald to pay $20,827.38 in Medicare Part A deductibles over the next fifteen years. The trial court then deducted the $20,827.38 from the $1,317,772.80 figure, concluding thereby that Donald will receive

Medicare Part A benefits of $1,296,945.42, which should be offset against the verdict pursuant to R.C. 2744.05(B).

{¶ 67} The trial court's formula assumes one of many possible combinations of jury findings concerning Donald's future damages. It assumes, *e.g.*, that the jury chose to award a total of $1,175,270 to Donald in damages unrelated to life expectancy. Yet, Dr. Harvey Rosen, plaintiff's economic expert, actually performed four separate calculations concerning Donald's lost wages alone, ranging between $901,040 and $1,659,708, depending upon Donald's projected age of retirement and expected promotions. The jury could have chosen any one of these figures, especially since there was sufficient testimony upon which the jury could have found that Donald would have received several promotions.

{¶ 68} The same is true as to the trial court's finding that the jury awarded $1,170,790.80 for future home health care. This figure was obviously arrived at by taking sixty percent of Dr. Rosen's calculations based on $8.50 per hour, for twenty-four hours per day, over a twenty-five-year life expectancy period. However, Dr. Rosen also performed calculations for future home health care based on $8 and $12 per hour, and for eight and sixteen hours per day, for a range in future home health care costs between $612,178 and $2,754,802. Moreover, the testimony at trial was sufficient to allow the jury to choose any of these calculations or a hybrid thereof.

{¶ 69} In addition, it is not a foregone conclusion that the jury opted to accept Dr. Rosen's figures coupled with a fifteen-year life expectancy. The record reflects a range of expert opinions regarding future hospitalizations between ten and thirty days per year at a cost of at least $1,300 per day; a range of differing opinions as to Donald's life expectancy between one year following trial and approximately twenty-four years; evidence regarding Donald's capability of returning to employment as a social worker between 1996 and 1998, after completing his education, at a starting salary of between $22,000 and $25,000; and widely divergent views on the amounts and methods used to calculate future

damages. Nor was the jury bound to accept any particular argument or expert calculation. The jury could have chosen to opt for various hybrid calculations by accepting parts of each expert's testimony or other testimony.

{¶ 70} Given the vastly divergent expert opinions on the issues that underlie the trial court's calculations, as well as the multitude of possible combinations thereof, there is simply no way to determine, with any reasonable degree of certainty, how the jury actually allocated Donald's future damages amongst the various damage components of Interrogatory No. 6. The methodology employed by the trial court, based as it is on so many unverifiable assumptions, places its calculations beyond the boundaries of the "reasonable degree of certainty" standard.

{¶ 71} Nevertheless, we cannot simply ignore that the verdict obviously comprises an award for future hospitalizations. It would be patently unjust, and contrary to R.C. 2744.05, to deny a political subdivision all rights of setoff for future Medicare Part A benefits, on the basis that it failed to quantify the exact amount of damages allocated by the jury to future hospitalizations, where it is clear that the verdict comprises an award for future hospitalizations.

{¶ 72} We hold, therefore, that Wayne Trace is entitled to a setoff against the verdict for future Medicare Part A benefits up to an amount that corresponds to the *minimum* amount that the jury could have awarded for future hospitalizations based on the evidence in the record. If we were to assume that the jury awarded more for future hospital costs than the minimum amount reflected in the record, we would be engaging in speculation.

{¶ 73} The minimum amount that the jury could have awarded Donald for future hospitalizations, based on the evidence in the record, is an amount equal to ten days per year at a cost of $1,300 per day over a ten-year life expectancy.[5] Thus,

---

5. The parties do not contend that the jury accepted the testimony of Wayne Trace's medical expert, Dr. Gary M. Yarkony, that Donald's life expectancy would not exceed one or two years. Also, the $1,300 figure was used instead of the $1,000 testified to by Dr. Yarkony because Dr. Yarkony

the maximum amount of Medicare Part A benefits that may be deducted from the verdict pursuant to R.C. 2744.05(B) is $123,480 (ten days per year multiplied by $1,300 per day, minus $652 yearly Medicare Part A deductible, over a period of ten years).

{¶ 74} We find that Donald will be eligible for Medicare over the ten-year period beginning February 1992. Stevenson testified that Donald became entitled to Medicare Part A benefits in February 1992 and that if such benefits were to be terminated on the basis of his return to substantial gainful activity, such termination would become effective thirty-nine months after Social Security disability benefits ceased (sometime in late 1998).

{¶ 75} The same considerations apply to Medicare Part B payments. Thus, Wayne Trace is entitled to a deduction for Medicare Part B payments in the amount of $10,928 ($1,466 per year in covered medical expenses minus $100 yearly Medicare Part B deductible, multiplied by ten years, and then multiplied by eighty percent).

3

Judgment Modified

{¶ 76} Accordingly, we modify the judgments of the courts below as they relate to R.C. 2744.05(B) collateral source deductions from the jury's verdict in favor of Donald, as follows:

Verdict                           $5,082,482.00
Collateral benefit setoffs
1. undisputed                      62,887.82
2. future Medicare benefits
        a - Part A                 123,480.00
        b - Part B                 10,928.00

---

admitted that his figure did not include the attending physicians' charges, and Wayne Trace conceded in closing argument that the $1,300 figure should be used.

3. Social Security benefits      101,353.60

TOTAL                  $4,783,832.58

## II

### Cross-Appeal; Videotaped Deposition

**{¶ 77}** On June 3, 1992, Wayne Trace took the videotaped deposition of Dr. Michael J. DeVivo at the Spain Rehabilitation Center, University of Alabama-Birmingham. At the time, Dr. DeVivo was an epidemiologist, an assistant professor at the University of Alabama-Birmingham and the manager of analytic services for the National Spinal Cord Injury Statistical Center. Also, at the time, it was Wayne Trace's intention to call Dr. DeVivo as a witness on its behalf.

**{¶ 78}** Prior to trial, however, Wayne Trace decided not to present Dr. DeVivo's deposition to the jury. Instead, the Buchmans played Dr. DeVivo's videotaped deposition to the jury as part of their case-in-chief.

**{¶ 79}** Wayne Trace claims that it was error to permit the Buchmans to use the videotaped deposition of Dr. DeVivo. It is Wayne Trace's position that although Civ.R. 32(A)(3) authorizes the use of a deposition of a witness taken by a party opponent, "[n]owhere in Civ.R. 32 is the use of the videotape of a deposition specifically addressed." Wayne Trace argues that the use of "the *videotape* of the deposition of Dr. DeVivo, in effect, makes Dr. DeVivo the Board's witness, in violation of the express intent of Civ.R. 32(C), because the jury can plainly hear that the direct examination of Dr. DeVivo was conducted by the Board's trial counsel." (Emphasis *sic*.) Accordingly, Wayne Trace concludes that where "one party has taken a deposition which has been videotaped and also transcribed, and the opposing party chooses to use that deposition as his own, then that deposition must be presented to the jury by reading it from the written transcript."

**{¶ 80}** Wayne Trace's entire argument is undercut by the Staff Notes (1972) to Civ.R. 32(A), which explain that:

"Rule 32(A) Use of Depositions

"The first sentence of Rule 32(A) has been amended to provide that a deposition may be 'presented as evidence' at trial. The quoted language replaces that language of the first sentence of the rule which had provided that a deposition may be 'read in evidence' at trial.

"Rule 30(B)(3) provides that a deposition may be 'recorded by other than stenographic means.' The language 'by other than stenographic means' obviously includes all forms of electronic recording of depositions including videotape. An electronically recorded deposition, under the appropriate circumstances for use of depositions at trial as provided by the subdivisions of Rule 32, would be 'presented as evidence' and not 'read into evidence.' Of course, a stenographically recorded deposition would be 'presented as evidence' at trial by 'reading' the deposition in evidence."

{¶ 81} Accordingly, Wayne Trace's argument lacks merit, see, also, *DiMarco v. Bernstein* (Oct. 13, 1988), Cuyahoga App. No.54406, unreported, and the judgment of the court of appeals is affirmed as to this issue.[6]

---

6. Wayne Trace also alleges that the videotape was played at a point during which the witness is identified as a witness for Wayne Trace. We find such error not to be prejudicial in light of the extensive supporting testimony by other medical experts in the case regarding Donald's life expectancy. Moreover, it would be anomalous to find prejudicial error in this case where it is unclear what the jury actually found as to Donald's life expectancy. Wayne Trace does not contend that Dr. DeVivo's opinions concerning Donald's life expectancy were accepted by the jury.

III

Summary

**{¶ 82}** The judgment of the court of appeals is affirmed in part and reversed in part. The jury verdict against Wayne Trace in favor of Donald Buchman is reinstated, but shall be reduced as set forth in Part I (E)(3), of this opinion.

*Judgment affirmed in part*

*and reversed in part.*

DOUGLAS and F.E. SWEENEY, JJ., concur.

MOYER, C.J., WRIGHT and COOK, JJ., concur in part and dissent in part.

PFEIFER, J., concurs in paragraph four of the syllabus and in judgment only.

_____

**WRIGHT, J., concurring in part and dissenting in part.**

**{¶ 83}** I concur in paragraphs one, two, three, five and six of the syllabus in this case. However, for the reasons stated in Chief Justice Moyer's dissenting opinion in *Sorrell v. Thevenir* (1994), 69 Ohio St.3d 415, 633 N.E.2d 504, which I joined, I believe that R.C. 2744.05(B) is constitutional as literally read. The constitutionality of R.C. 2744.05(B) is further buttressed by the state's important interest in preserving the financial soundness of its political subdivisions. Under the unambiguous language of R.C. 2744.05(B), *all* collateral benefits received by a claimant should be "deducted from any award against a political subdivision," not merely those benefits that are actually included in a jury's award. Accordingly, I dissent to paragraph four of the syllabus.

MOYER, C.J., and COOK, J., concur in the foregoing opinion.

_____

**PFEIFER, J.**

{¶ 84} I concur in paragraph four of the syllabus and in judgment only. I would apply this court's analysis in *Sorrell v. Thevenir* (1994), 69 Ohio St.3d 415, 633 N.E.2d 504, to this case and hold that R.C. 2744.05(B) is unconstitutional.

———————————