

# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

DENNIS D. MILLER, Admr., etc.

      Plaintiff

      v.

OHIO DEPARTMENT OF TRANSPORTATION, et al.

      Defendants

Case No. 2009-07679

Judge Patrick M. McGrath

DECISION

{¶ 1} Plaintiff, Dennis Miller, brings this action for wrongful death against defendants, Ohio Department of Transportation (ODOT) and the State of Ohio, on behalf of himself and the heirs of decedent, Pauline Miller. The issues of liability and damages were bifurcated. Following a trial on the issue of liability, the court found that ODOT's negligence in failing to maintain the roadway in a reasonably safe condition was the sole proximate cause of a collision in which Pauline's automobile was struck by a box truck. Pauline was killed in the accident. The court determined that but for the existence of potholes in the roadway, the motor vehicle collision would not have occurred. The case then proceeded to trial on the issue of damages.[1]

{¶ 2} Dennis met Pauline while he was working as an automobile mechanic. Pauline needed assistance with her automobile and Dennis readily offered to help. At that time, Pauline was working as a staff nurse while pursuing an advanced nursing

---

[1]Plaintiff's March 1, 2013 "motion for leave to file, instanter, post-trial brief 21 pages in length" is GRANTED.

degree.  Dennis and Pauline subsequently began dating and eventually married a year and a half later, in 1984.  They have two children, Rachael and Nathan.

{¶ 3} Early in the morning on March 11, 2008, Pauline left the house for her shift at the hospital.  Prior to beginning her shift, Pauline planned to visit Dennis' brother who was scheduled to undergo eye surgery.  Shortly after 7:00 a.m., Dennis returned home from working the night shift.  After arriving at home, Dennis saw highway patrol cars approach his home.  The highway patrol troopers then informed him that Pauline had been in an accident and had passed away.  Dennis woke up Nathan, who was asleep in bed at their home, and the two drove to the accident scene where they saw Pauline's car being loaded onto a truck.  The two then drove to the hospital to see Pauline.  Rachael, who was working in Hawaii for Mesa Airlines, received a telephone call wherein she was informed of Pauline's death, and she immediately flew to Ohio to be with her family.

{¶ 4} R.C. 2125.02 provides, in part:

{¶ 5} "(A)(2) The jury, or the court if the civil action for wrongful death is not tried to a jury, may award damages authorized by division (B) of this section, as it determines are proportioned to the injury and loss resulting to the beneficiaries in division (A)(1) of this section by reason of the wrongful death and may award reasonable funeral and burial expenses incurred as a result of the wrongful death. * * *[2]

{¶ 6} "* * *

{¶ 7} "(B) Compensatory damages may be awarded in a civil action for wrongful death and may include damages for the following:

{¶ 8} "(1) Loss of support from the reasonably expected earning capacity of the decedent;

{¶ 9} "(2) Loss of services of the decedent;

_____

[2]Plaintiff did not present any evidence of funeral or burial expenses.

**{¶ 10}** "(3) Loss of the society of the decedent, including loss of companionship, consortium, care, assistance, attention, protection, advice, guidance, counsel, instruction, training, and education, suffered by the surviving spouse, dependent children, parents, or next of kin of the decedent;

**{¶ 11}** "(4) Loss of prospective inheritance to the decedent's heirs at law at the time of the decedent's death;[3]

**{¶ 12}** "(5) The mental anguish incurred by the surviving spouse, dependent children, parents, or next of kin of the decedent."

**{¶ 13}** Pursuant to R.C. 2125.02(A)(3)(b)(i), the "court may consider all factors existing at the time of the decedent's death that are relevant to a determination of the damages suffered by reason of the wrongful death."

**ECONOMIC DAMAGES**

**{¶ 14}** Dennis testified that Pauline worked as a nurse at St. Elizabeth Health Center (St. Elizabeth's) and also taught nursing courses two times per week at the Choffin School of Practical Nursing. Mary Ann Turjanica testified that she worked with Pauline at St. Elizabeth's as a clinical nurse specialist for approximately four years. Mary Ann explained that a clinical nurse specialist is an expert bedside nurse who educates the clinical bedside nurse as well as develops clinical policy and performs research. According to Mary Ann, Pauline's duties included developing policy and standards for nurses to follow; compiling educational material; performing research; providing clinical care consultations for the floor nurse in order to better assess the patient; and ensuring that the patient receives appropriate care. Mary Ann testified that Pauline published an article regarding bed sores on the ears of patients that is one of the only published studies on such a topic.

---

[3]Plaintiff did not present any evidence as to loss of prospective inheritance.

{¶ 15} Mary Ann testified that nursing was important to Pauline and that she had a life-long goal of continuing to learn as well as educate other nurses. Dennis testified that "retirement" was not a word in Pauline's vocabulary and that nothing stopped Pauline from continuing to work well into her 60s or 70s. According to Dennis, Pauline loved her job, enjoyed working and would have continued to work until she was no longer able to do so.

{¶ 16} Plaintiff presented the expert testimony of John Burke, Ph.D., regarding Pauline's expected earning capacity. Dr. Burke has taught economics at various universities throughout his career and is currently teaching at John Carroll University. Dr. Burke calculated the earning capacity for Pauline, who was 48.9 years old at the time of her death. Dr. Burke explained that four factors are necessary to calculate an individual's expected earning capacity: (1) how long a person will be an active member of the workforce; (2) an individual's track record of pay and benefits in the work force; (3) future rate of pay and benefits; and (4) the interest rate.

{¶ 17} Dr. Burke explained that he calculated Pauline's expected earnings based upon three possible retirement ages for Pauline: 66 years 10 months, which is Social Security Retirement age, 70, and 75 years. Dr. Burke testified that according to the United States Department of Labor (DOL), Pauline's statistical work-life expectancy at the time of her death was 59.3 years; however, Dr. Burke did not provide the court with expected earnings based upon such a figure.

{¶ 18} Dr. Burke next considered Pauline's earning capacity. Dr. Burke examined Pauline's W2s from 2005 through 2008. Dr. Burke explained that he typically reviews five years of an individual's income history, but that in this case, he also reviewed Pauline's Social Security earnings record for her entire work history. Dr. Burke testified that after compiling such data, he then "grew" Pauline's wages forward using the Employment Cost Index (ECI), a measure of the average American worker's income growth by year, produced by the DOL. Dr. Burke explained that he used figures that

represent actual wage growth of the average American worker through 2012 and that the future wage growth rate was calculated at .45%, a figure which he received from the ECI. However, Dr. Burke admitted that such wage growth numbers were not available in Pauline's specific work sector and that he did not compare Pauline's expected wage growth with the actual wage growth of Pauline's former co-workers. Dr. Burke testified that he used a discount rate of zero to determine the present value of Pauline's wages beyond 2013. Dr. Burke explained that a discount rate of zero means that the long term interest rate equals long term inflation. Dr. Burke then added fringe benefits to Pauline's earning capacity. Finally, Dr. Burke testified that he subtracted a portion of Pauline's income to reflect her personal consumption.

{¶ 19} Using such a methodology, Dr. Burke testified that had Pauline worked through the age of 70, the present value of her wages and fringe benefits, minus personal consumption, would be $1,582,379. Alternatively, through the age of 66 years 10 months, such a figure would be $1,300,000 and through 75 years, $1,900,000.

{¶ 20} Based upon the evidence, the court finds that Pauline would have retired at the age of 66 years and 10 months. Indeed, the court is convinced that Pauline would have continued to work both at the hospital as a nurse and as an educator teaching nurses in nursing school until the age of 66 years 10 months. The greater weight of the evidence demonstrates that Pauline was a dedicated employee who had no intention of leaving the workforce at the age of 59.3. Additionally, the court is convinced by the testimony of Mary Ann and Dennis that Pauline would have worked at both places of employment until the age of Social Security Retirement. Given Pauline's demanding work schedule at two separate places of employment, the court finds it unlikely that Pauline would have continued to work through the age of 70 or 75. The court further finds that Dr. Burke credibly testified regarding the methodology he employed in determining Pauline's expected earning capacity. Accordingly, the court

awards damages for loss of support based upon Pauline's reasonably expected earning capacity in the amount of $1,300,000 pursuant to R.C. 2125.02(B)(1).

{¶ 21} Plaintiff also seeks compensation for the loss of Pauline's services. Dr. Burke testified that according to a study by the DOL, a female employed outside the home spends approximately 2.5 hours per day on household services. Dr. Burke explained that the performance of such services occurs on an intermittent basis throughout the day rather than in a single complete episode. Dr. Burke stated that after retirement, the amount of services provided increases to 3.7 hours per day. Based upon such data, Dr. Burke calculated that paying someone the minimum wage to perform household services would cost $243,000. Dr. Burke stated that such a figure was calculated through Dennis' life expectancy, the person for whom the services would be provided. The court finds that $243,000 is a reasonable amount for loss of services and that amount is awarded pursuant to R.C. 2125.02(B)(2).

**NON-ECONOMIC DAMAGES**

{¶ 22} The remaining elements of wrongful death damages are non-economic losses: loss of society and mental anguish. R.C. 2125.02(A)(1) provides that "a civil action for wrongful death shall be brought in the name of the personal representative of the decedent for the exclusive benefit of the surviving spouse, the children, and the parents of the decedent, all of whom are rebuttably presumed to have suffered damages by reason of the wrongful death, and for the exclusive benefit of the other next of kin of the decedent." There is no dispute that Dennis, Rachael, and Nathan have suffered non-economic damages as a result of Pauline's death.

{¶ 23} Dennis testified that he and Pauline enjoyed visiting people who were lonely or in need. Dennis stated that they had a goal of helping other people and enjoyed that part of their lives together. Dennis stated that he and Pauline planned to renew their wedding vows and exchange new rings for their 25th wedding anniversary.

Dennis had purchased the rings prior to the accident, but now keeps the rings as a way to remember Pauline. Dennis testified that after Pauline's death, he struggled sleeping at nights, sometimes sleeping only for a few hours and that he now regularly sleeps for three or four hours per night. According to Dennis, prior to Pauline's death, he had no significant health or stress problems. After Pauline's death, he began taking anti-depressants, but they were of little help.

{¶ 24} According to Deborah Miller, Dennis' sister-in-law, Dennis and Pauline were sweethearts who were always together. Deborah testified that Dennis seems lost and incomplete without Pauline. Dennis testified that he retired in August 2012 from his employment as a maintenance electrician of 26 years because he could no longer handle the stress and burdens associated with being a working, single parent. Dennis testified that he continues to think about Pauline every day.

{¶ 25} Nathan testified that he currently lives with his dad, Dennis. Nathan is studying computer and information systems and will graduate from Youngstown State University with his masters degree in 2013. Nathan plans to pursue a Ph.D. in computer engineering. Nathan testified that Pauline made him the center of her world. Both Nathan and Rachael were home-schooled through the eighth grade by their mother, Pauline. In their home, they had a dedicated classroom that Pauline tried to make as authentic as she could. Nathan testified that his mother encouraged him to pursue all aspects of learning including the arts and music. Nathan testified that after his dad informed him of the accident, the two of them went to the accident scene to see what had happened. Nathan testified that the funeral was overwhelming because he was able to see how many people Pauline had affected. Nathan testified that prior to the accident, Pauline was very involved with his life and that he now feels a void or an "emptiness" in his life. Nathan testified that he now dreams about her, often waking up thinking that the accident did not actually happen. Nathan testified that Pauline taught him to treat others with respect.

{¶ 26} Rachael testified that she currently lives in Kent, Ohio, and is working on her pilot's license after recently graduating from Kent State University. Rachael's goal is to become a commercial pilot. Rachael testified that Pauline made learning fun and that she looked for ways to make learning an experience. Rachael testified that her mother was her best friend and that the two of them would talk on the telephone multiple times a day. Rachael viewed her parent's marriage as an ideal marriage. Rachael stated that they were always very supportive of each other. Rachael was in Hawaii working for Mesa Airlines when she learned of her mother's death. Rachael testified that she flew back to Ohio by herself and that she was unable to eat or sleep for days after learning of the accident. Rachael moved back to Ohio after the accident and into her parent's house. Rachael stated that home simply was not the same and that there is a void of "nothingness" in the home now. Rachael testified that she misses her mother's spirit and passion for life and wishes that her mother could be a part of her future to offer her guidance and support.

{¶ 27} Based upon the evidence and testimony presented at trial, the court is convinced that Pauline was a loving wife and mother and that her death caused much mental suffering for Dennis, Rachael, and Nathan. The court is convinced that Pauline had a close relationship with her family. Although Dennis testified that he received anti-depressants for a short time, there is no evidence that he was formally diagnosed with anxiety or depression or that he is currently being treated for such issues. Pursuant to R.C. 2125.02(B), Pauline's spouse and dependent children are entitled to non-economic damages. Upon consideration of the testimony presented, Dennis is awarded $1,000,000 and Rachael and Nathan are each awarded $400,000. Therefore, the court awards non-economic damages for loss of society and mental anguish in the total amount of $1,800,000.

{¶ 28} In summary, $3,343,025 shall be awarded for plaintiff's wrongful death claim, which includes the $25 filing fee.

**{¶ 29}** R.C. 2743.02(D) provides that:

**{¶ 30}** "Recoveries against the state shall be reduced by the aggregate of insurance proceeds, disability award, or other collateral recovery received by the claimant."

**{¶ 31}** Pursuant to *McMullen v. Ohio State Univ. Hosps.,* 88 Ohio St.3d 332, 342 (2000), this court has the duty to deduct collateral benefits received by each beneficiary from that beneficiary's share of the award as adjusted by the probate court. This court makes the collateral-source deductions only after the probate court has adjusted the share of each beneficiary pursuant to R.C. 2125.03(A)(1). *Id.; see also Buchman v. Bd. of Edn.,* 73 Ohio St.3d 260 (1995); *Robertson v. Dept. of Public Safety*, Ct. of Cl. No. 2001-09214, 2005-Ohio-5069.

**{¶ 32}** Evidence of any collateral recovery will be introduced in a hearing subsequent to the conclusion of the proceedings before the probate court. The court will conduct periodic conferences to discuss the status of the probate court proceedings. The first of such conferences shall be held on *June 28, 2013, at 10:00 a.m.* The court shall initiate the conference via telephone.

_____
PATRICK M. MCGRATH
Judge

[Cite as *Miller v. Ohio Dept. of Transp.*, 2013-Ohio-3635.]



# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

DENNIS D. MILLER, Admr., etc.

     Plaintiff

     v.

OHIO DEPARTMENT OF TRANSPORTATION, et al.

     Defendants

Case No. 2009-07679

Judge Patrick M. McGrath

JUDGMENT ENTRY

{¶ 33} This case was tried to the court on the issue of plaintiff's damages. The court has considered the evidence and, for the reasons set forth in the decision filed concurrently herewith, judgment is rendered in favor of plaintiff in the amount of $3,343,025, which includes the $25 filing fee paid by plaintiff.

{¶ 34} This court shall conduct a hearing on the issue of collateral source setoff and enter final judgment after the probate court completes its apportionment. A status conference is scheduled for *June 28, 2013, at 10:00 a.m.,* to discuss the status of the probate proceedings. The court shall initiate the conference via telephone.

_____
PATRICK M. MCGRATH
Judge

cc:

Ellen M. McCarthy                        Emily M. Simmons
Jamie R. Lebovitz                        William C. Becker
1370 Ontario Street, Suite 100           Assistant Attorneys General
Cleveland, Ohio 44113-1792               150 East Gay Street, 18th Floor
                                         Columbus, Ohio 43215-3130

003
Filed April 4, 2013
To S.C. Reporter August 22, 2013