[Cite as *Zavinski v. Ohio Dept. of Transp.*, 2019-Ohio-1735.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Monique Zavinski, Executrix of the Estate of Dennis Zavinski, deceased, | : | |
| | : | |
| Plaintiff-Appellant/ Cross-Appellee, | : | No. 18AP-299 |
| | | (Ct. of Cl No. 2013-00452JD) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| Ohio Department of Transportation, | : | |
| | : | |
| Defendant-Appellee/ Cross-Appellant. | : | |
| | : | |

D E C I S I O N

Rendered on May 7, 2019

**On brief:** *Stark & Knoll*, and *Orville L. Reed, III*; *Dennis J. Bartek*; and *Niekamp, Weisensell, Mutersbaugh & Mastrantonio, L.L.P.,* and *Natalie M. Niese*, for appellant/cross-appellee. **Argued:** *Orville L. Reed, III,* and *Dennis J. Bartek.*

**On brief:** *Dave Yost*, Attorney General, *William C. Becker*, *Stacy Hannan*, and *Amy S. Brown*, for appellee/cross-appellant. **Argued:** *William C. Becker*.

APPEAL from the Court of Claims of Ohio

LUPER SCHUSTER, J.

{¶ 1} Plaintiff-appellant/cross-appellee, Monique Zavinski, executrix of the estate of Dennis Zavinski, deceased, appeals and defendant-appellee/cross-appellant, the Ohio Department of Transportation ("ODOT"), cross-appeals from a judgment of the Court of Claims of Ohio awarding damages in favor of Monique in her wrongful death action against ODOT. For the following reasons, we affirm in part and reverse in part.

## I. Facts and Procedural History

{¶ 2} At approximately 7:40 a.m., on September 10, 2011, Monique's husband Dennis was killed in a motor vehicle accident on State Route 14 ("SR 14") in Streetsboro, Ohio, when a tractor-trailer driven by uninsured motorist Freddie Pampley crossed the center line and struck Dennis' vehicle. In August 2013, Monique, as the executrix of Dennis' estate, initiated a wrongful death action against ODOT, alleging that ODOT's negligence in directing, supervising, and accepting a paving company's resurfacing of SR 14 proximately caused the fatal accident. In September 2013, and in view of a pending connected action Monique filed against the paving company in the Summit County Court of Common Pleas, the Court of Claims stayed the action before it until the final disposition of the connected action. The collateral case settled in November 2014, and soon thereafter the Court of Claims lifted the stay in this matter. The Court of Claims bifurcated the issues of liability and damages for trial. In November 2015, ODOT moved for summary judgment on the basis that it had no notice of the alleged pavement defect and the pavement condition was not the cause of the accident. In December 2015, the Court of Claims denied ODOT's motion for summary judgment. The issue of ODOT's liability was tried before a magistrate of the trial court in February 2016, and, as pertinent to this appeal, the following evidence was adduced at trial.

{¶ 3} Streetsboro Chief of Police, Darin Powers, testified at trial regarding his investigation of the September 10, 2011 fatal accident. At the time of the accident, Dennis' vehicle was traveling eastbound, the tractor-trailer was traveling westbound, and there was a steady rain. At the location of the accident, the speed limit is 50 miles-per-hour, and the roadway is one lane in both directions. After the accident, Chief Powers spoke with Freddie Pampley, the driver of the tractor-trailer, and his passenger, Jermaine Williams. Williams said very little to Chief Powers other than indicating he told Pampley before the accident to "look out," and that they were involved in a crash. (Feb. 8, 2016 Tr. Vol. 1 at 60.) Pampley, an uninsured motorist whose license was under suspension, told Chief Powers that he lost control of the vehicle, but he did not know how or why he lost control. The Ohio State Highway Patrol ("OSHP") was also involved in the investigation, and an investigating patrolman estimated that Pampley was driving the tractor-trailer at 55 miles-per-hour immediately before the collision. It quickly became apparent to the investigators that the

collision had been caused when Pampley lost control of his vehicle.  Chief Powers knew that SR 14 had been repaved in May 2011, and he began to research the number of accidents at that location when the pavement was wet.  Because Chief Powers found that the number of accidents in that area was higher than expected, he voiced concern to ODOT about the roadway.  In response to Chief Powers' inquiry, ODOT scheduled friction testing on the roadway for October 3, 2011.  ODOT conducted a second test at the location of the accident on October 21, 2011.  Chief Powers lacked any knowledge that ODOT was on notice before the accident of any concerns regarding SR 14.

{¶ 4}  Brian Schleppi, the highway infrastructure section supervisor for ODOT, testified regarding his role in investigating the road conditions of SR 14.  He is one of the top experts at ODOT regarding road surface friction and skid testing, and he authored "ODOT's Guide to Understanding and Interpreting Locked Wheel Friction Data, Ribbed and Smooth Test Tires."  ODOT strives to provide sufficient available friction on all of the roadways under its control, and new roadway surfacing should provide that friction well-beyond six months.  In determining whether a roadway has sufficient available friction, an evaluator must consider the friction demand based on such factors as travel speeds and any curvatures in the road.  Also, to determine sufficiency, evaluators look at wet available friction because if the roadway has sufficient friction when wet, it will have sufficient friction when dry.  Thus, the "higher frictional demand, the higher the sufficient level of available wet friction should be."  (Feb. 8, 2016 Tr. Vol. 1 at 141.)  Based on differences in these demands, sufficient friction for one roadway may not be sufficient friction for another roadway.

{¶ 5}  The available friction of a roadway is evaluated in terms of its macrotexture and microtexture.  Macrotexture is the texture of the surface that can be seen, and microtexture is the texture of the surface that can be felt but not seen.  Macrotexture provides a mechanism for water to "evacuate when the tire comes along such that the rubber of the tire and the microtexture of the surface can make contact" and therefore "reduces the hydroplaning potential."  (Pl.'s Ex. 4, ODOT's Guide to Understanding and Interpreting Locked Wheel Friction Data at 1.)  "Microtexture is really where the rubber meets the road."  (Pl.'s Ex. 4 at 1.)  Schleppi explained that hydroplaning occurs when a

vehicles' tires are no longer in contact with the road surface and are "entirely riding on a film of water."  (Feb. 8, 2016 Tr. Vol. 1 at 156.)

{¶ 6}  Schleppi tests the macrotexture and microtexture levels of roadways using an accepted testing mechanism that involves dragging a rubber tire across a roadway in controlled circumstances and evaluating the friction data results.  Roadway friction testing is done when there are concerns regarding the performance of a roadway or when a new asphalt mixture is being considered for use.  After being contacted by Chief Powers, Schleppi had his staff test SR 14 at the scene of the accident.  They first tested the typical wheel path along the roadway, and then they returned to test an area closer to the white fog line that was the actual wheel path for that particular roadway area.  As a result of the October 21, 2011 testing, Schleppi determined there was "insufficient available wet friction."  (Feb. 8, 2016 Tr. Vol. 1 at 213.)  This result alarmed him, and he considered it unreasonably dangerous for users of the roadway.  The individual who actually performed the testing on the roadway, Andrew Clouse, had noted to Schleppi that the "surface looked to have been bleeding."  (Feb. 8, 2016 Tr. Vol. 1 at 215.)

{¶ 7}  Sonya Moyer was driving behind the tractor-trailer before the accident.  She estimated her speed at 50 miles-per-hour and the tractor-trailer's at approximately 55-60 miles-per-hour.  Immediately before the collision, she saw the trailer cross the center line and go into the oncoming traffic lane.  It looked to her like the back of the trailer hydroplaned.

{¶ 8}  David Powers, a civil engineer, is the director of ODOT's test lab in the asphalt material section.  Powers, who is unrelated to Chief Powers, testified that his lab did not analyze any samples from the SR 14 repaving project, but it did approve the contractor's asphalt "mix design" or "recipe" for the project.  (Feb. 9, 2016 Tr. Vol. 2 at 254.)  The mix design determines the proportionate attributes of aggregate, air, and asphalt binder in the mix. Typically, Powers' central lab is not involved in sample testing in the field as that task is usually performed at the district level.  Samples are typically taken from the plant producing the asphalt mixture for the project, and those samples are tested to confirm compliance with ODOT's required specifications for that project.  The mix design for the May 2011 SR 14 repaving project was approved in March 2011.

{¶ 9}   After the accident, Schleppi notified Powers about a possible problem with the SR 14 project.  Powers contacted the district engineer, Marla Penza, who indicated there was nothing in the quality control records to indicate any problems on the project.  However, Powers recalled reviewing an email from Clouse, who had performed the friction testing at Schleppi's direction, wherein he said there was "flushing" on the roadway.  (Feb. 9, 2016 Tr. Vol. 2 at 283.)   Powers testified that "flushing" or "bleeding" are synonymous terms used to describe an asphalt mix that has excessive asphalt binder.  (Feb. 9, 2016 Tr. Vol. 2 at 270.)  The excess asphalt binder goes to the surface thereby causing reduced friction.  Powers explained that permitting traffic on the roadway before the applied asphalt cooled to a certain temperature can compromise the structure of the asphalt and its texture.  Powers agreed that the October 2011 friction testing results were not acceptable for a roadway that had been recently repaved.

{¶ 10}  Penza, a civil engineer and manager of ODOT's District 4 testing laboratory, testified that ODOT provides specifications for each project and the asphalt producer submits its formula for approval at the local level or at ODOT's central office.  During each project, Penza's lab performs daily testing on the applied asphalt to confirm its conformity to the required specifications.  Penza was informed of the October 2011 friction testing and she personally visited the site of the accident.  She did not observe any flushing on the roadway.  Penza testified that asphalt applied to a road should last 10 to 12 years.  In regard to the SR 14 project, the testing results for the applied asphalt did not reveal any problems.

{¶ 11}  Thomas Yager, Monique's engineering expert, is employed with NASA, and has done extensive work looking at pavement friction performance.  He has authored a chapter in a professional publication addressing hydroplaning with respect to unloaded tractor-trailers.  Yager testified that unloaded tractor-trailers can hydroplane at or below normal highway speeds, and that unloaded tractor-trailers are several times more prone to loss of control issues during wet weather than loaded tractor-trailers.  Yager compared the microtexture of a roadway to the roughness of sandpaper and described the macrotexture of a roadway as larger dimension voids that promote drainage of water away from the tire footprint.  Yager testified that applying an engine brake on a truck involves using the engine itself to decelerate a vehicle.  He also explained that when a vehicle hydroplanes there is no braking force because the vehicle's tires are not in contact with the ground but are riding

on a thin film of water. He testified that a newly repaved roadway should be reasonably safe for users of the roadway for eight to ten years. He opined that the friction testing results from October 2011 demonstrated that the roadway had insufficient friction in generally all circumstances. Although he did not reconstruct the accident, based on his review of the October 2011 friction testing results, Yager opined that the SR 14 roadway lacked adequate macrotexture and that the lack of pavement friction caused the accident on September 10, 2011.

{¶ 12} Jermaine Williams, a passenger in the tractor-trailer, testified that on the day of the accident he was a driver in training and Freddie Pampley was his trainer. Pampley was driving the truck in the rain on SR 14 after delivering cargo in Streetsboro when he stated to Williams: "I'm about to do something. I'm experienced. Don't you ever do this." (Feb. 9, 2016 Tr. Vol. 2 at 476.) Pampley applied the engine brake as they went through a curve in the road and the trailer started to rotate. Williams and Pampley were thrown from their seats, and the vehicle came to a stop in the ditch. Williams further testified that, based on his truck driving experience and training, he believed the accident was Pampley's fault because he should not have used the engine brake under the circumstances.

{¶ 13} Timothy Tuttle, ODOT's accident reconstruction expert and retired OSHP officer, testified that he received extensive training and experience performing accident investigations and reconstructions during his time with the OSHP. On August 23, 2015, Tuttle examined the accident scene and completed a topographical and forensic survey of the area. He created a diagram of the accident scene from the information he gathered, and he used that diagram to work backwards to determine how the crash occurred. He also used a computer program to reconstruct the accident. Based on his investigation and reconstruction work, Tuttle concluded that Pampley's application of the engine brake pulled the tractor-trailer slightly to the right, and that Pampley overcorrected and steered the vehicle too far left into the oncoming lane. Pampley then steered back to the right off the road and into a guardrail, causing him to lose all control of the vehicle. Tuttle opined that insufficient available friction was not a contributing cause of the accident.

{¶ 14} Based on the evidence presented at trial, the magistrate determined that ODOT breached its duty to maintain its highways in a reasonably safe condition for the traveling public and that this breach proximately caused the fatal accident. The magistrate

also found that Pampley's negligent driving was also a proximate cause of the accident. The magistrate determined that the percentage of tortious conduct that proximately caused the wrongful death is attributable 50 percent to Pampley and 50 percent to ODOT. Thus, the magistrate recommended judgment in favor of Monique with a 50 percent reduction to account for Pampley's negligence. Monique objected to the degree the magistrate attributed the percentage of tortious conduct proximately causing the accident to Pampley. She argued ODOT's negligence was the predominant cause of the accident, not an equal cause with Pampley's negligence. ODOT also filed objections, arguing the magistrate erroneously held ODOT strictly liable for a latent defect, erred in finding the roadway unreasonably dangerous at the time of the accident, and erred in finding ODOT's negligence was a proximate cause of the accident. The trial court overruled the objections, adopted the magistrate's decision on liability, and entered judgment accordingly.

{¶ 15} Based on the trial court's liability finding, the matter proceeded to a damages trial in September 2017. Alex Constable, Monique's economic expert, testified that her economic loss totals $478,522 in present value, based on her husband's earning capacity and the value of household services he provided. Additionally, Monique testified regarding the significant impact the loss of her husband has had on her life. She recalled fondly their adventures traveling, playing tennis, and enjoying other leisure activities. However, after Dennis died, she "found [herself] all alone and not capable to face life." (Sept. 5, 2017 Tr. Vol. 1 at 73.) Monique's family and friends testified regarding her deterioration from a delightful, beautiful woman, to a very anxious, unhealthy woman. Her serious depression is an ongoing concern, and she has been physically failing and "looks like she came out of a concentration camp." (Sept. 5, 2017 Tr. Vol. 1 at 127.) Instead of improving over time, Monique's inability to deal with her husband's death has worsened.

{¶ 16} ODOT presented evidence at the damages trial demonstrating that Dennis' estate received $885,000.00 as part of an uninsured motorists insurance coverage settlement with Dennis' insurance carriers, and $250,000.00 in a settlement with ODOT's contractor on the SR 14 pavement project. ODOT also presented evidence that Dennis' estate received $125,000.00 based on his half-interest in the law office where he practiced and $33,475.28 as income from his law practice.

{¶ 17} Based on the evidence presented at the damages trial, the magistrate recommended an award in favor of Monique in the amount of $478,522.00 for economic damages and $2,500,000.00 for non-economic damages, with a 50 percent reduction for Pampley's negligence, and a $1,293,475.28 total reduction for the multiple collateral benefits received. Monique presented five objections to the magistrate's damages decision, all of which challenged the collateral benefits reductions. ODOT filed an objection to the $2,500,000.00 non-economic damages award. The trial court overruled ODOT's objection, sustained Monique's objections insofar as the magistrate had recommended a collateral benefits reduction greater than $1,135,000.00, and otherwise overruled Monique's objections. The trial court ruled the magistrate erred in determining that the estate's recovery of Dennis' interest in the law office ($125,000.00) and his law practice income ($33,475.28) should be applied as collateral benefits to reduce Monique's recovery against ODOT. Accordingly, the trial court entered final judgment against ODOT awarding Monique damages in the amount of $354,286.00, which represented total damages against ODOT in the amount of $1,489,261.00 less collateral recovery of $1,135,000.00.

{¶ 18} Monique appeals, and ODOT cross-appeals.

## II. Assignments of Error

{¶ 19} Monique assigns the following error for our review:

> The trial court erred to the prejudice of Plaintiff by improperly determining that the sum of $885,000 paid to her by uninsured motorist carriers, for the negligence of Pampley, an uninsured motorist, was a "collateral benefit" within the meaning of R.C. 2743.02(D) and then deducting that amount from the sum of money owed by ODOT for its negligence in causing the death of Dennis Zavinski.

{¶ 20} ODOT assigns the following errors for our review:

> 1. The trial court erred as a matter of law in applying strict liability and finding that ODOT breached its duty to maintain the road where the accident in this case occurred.
>
> 2. The trial court erred in not finding the semi-tractor trailer driver solely at fault for this accident or alternatively, at a greater percentage than equally at fault with ODOT.

3. The trial court erred in introducing evidence of the subsequent skid testing of the roadway.

4. The bench trial award of non-economic damages was excessive.

5. The trial court erred in holding that the sale of Mr. Zavinski's law firm and collection of attorney fees were not collateral source set offs.[1]

## III.  Discussion

{¶ 21} ODOT's first assignment of error alleges the trial court erroneously applied a strict liability standard and found that it breached its duty to maintain the road at the location of the fatal accident.  This assignment of error lacks merit.

{¶ 22} The trial court did not hold ODOT strictly liable for the accident.  Strict liability "is liability that does not depend on actual negligence or intent to harm, but that is based on the breach of an absolute duty to make something safe." *Black's Law Dictionary* (9th Ed.2009).  Strict liability is also considered "liability without fault." *Comer v. Risko*, 106 Ohio St.3d 185, 2005-Ohio-4559, ¶ 26.  Here, the trial court imposed liability on ODOT based on its findings that ODOT breached its duty to maintain SR 14 in a reasonably safe condition, and that this negligent conduct proximately caused the fatal accident.

{¶ 23} In order to sustain an action for negligence, a plaintiff must show the existence of a duty owing from the defendant to the plaintiff or injured party, a breach of that duty, and that the breach was the proximate cause of resulting damages. *Strother v. Hutchinson*, 67 Ohio St.2d 282, 285 (1981).  Whether a duty exists in a negligence action is a question of law, but whether that duty was breached and whether the breach proximately caused an injury are normally questions of fact to be decided by the trier of fact. *Kemer v. Ohio Dept. of Transp.*, 10th Dist. No. 09AP-248, 2009-Ohio-5714, ¶ 16.  We review questions of law de novo. *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm*, 73 Ohio St.3d 107, 108 (1995).  However, a trial court's determinations of fact are given great deference. *Id.* "We are bound to accept the trial court's findings of fact if they are supported

---

[1] ODOT has withdrawn its fifth assignment of error.

by competent, credible evidence." *Hill v. Briggs*, 111 Ohio App.3d 405, 412 (10th Dist.1996).

{¶ 24} ODOT has a general duty to maintain its highways in a reasonably safe condition for the traveling public. *Knickel v. Dept. of Transp.*, 49 Ohio App.2d 335 (10th Dist.1976); *Estate of Marlee Grace Morgan v. Ohio Dept. of Transp.*, 10th Dist. No. 10AP-362, 2010-Ohio-5969, ¶ 11; R.C. 5501.11(A)(1); R.C. 5535.08(A). This duty is not delegable. *See Roadway Express, Inc. v. Ohio Dept. of Transp.*, 10th Dist. No. 00AP-1119 (June 28, 2001) (ODOT's duty remains even when it contracts with a party to perform the actual construction work).

{¶ 25} The state, however, is not an insurer of the safety of travelers on its highways. *Rhodus v. Ohio Dept. of Transp.*, 67 Ohio App.3d 723 (10th Dist.1990). ODOT is not liable for damages caused by a hazard on a state highway unless ODOT had actual or constructive notice of the hazard, or ODOT was actively negligent in creating the hazard. *McClellan v. Ohio Dept. of Transp.*, 34 Ohio App.3d 247, 249 (10th Dist.1986); *see Byrd v. Arbors E. Subacute & Rehab. Ctr.*, 10th Dist. No. 14AP-232, 2014-Ohio-3935, ¶ 10 ("When the business owner creates the hazardous condition which causes the plaintiff's injury, the plaintiff need not demonstrate that the business owner had actual knowledge or constructive notice of the hazardous condition."); *Crane v. Lakewood Hosp.*, 103 Ohio App.3d 129, 136 (8th Dist.1995) ("[O]ne who has created the condition is presumed to know what it created."). Active negligence occurs when "the tort committed is through the tortfeasor's actual participation in the tort or his knowing acquiescence in the continuation of a dangerous situation which gives rise to the injury." *Nevins v. Ohio Dept. of Transp.*, 132 Ohio App.3d 6, 26 (10th Dist.1998).

{¶ 26} The record contains competent, credible evidence that ODOT breached its duty to maintain SR 14 in a reasonably safe condition for travelers. According to the testimony at trial, the roadway, which was paved in May 2011, should have been structurally sound and sufficiently textured for eight to ten years, or even more. Despite this useful life expectation, the testimony of Monique's expert, Yager, indicated the October 2011 friction testing results demonstrated an unreasonably dangerous condition. Schleppi, ODOT's expert regarding roadway surface friction, agreed that results of the October 2011 friction testing indicated the roadway was unreasonably dangerous. ODOT asserts, however, that

other evidence demonstrated that the mixture used for the repaving project had been approved for use and that sample testing conducted during the project showed conformity with the approved mixture specifications as to the aggregate, asphalt binder, and air contained therein. However, flushing was observed when the roadway was tested in October 2011. The appearance of flushing indicates a problem with applied asphalt because that condition occurs when too much liquid asphalt binder rises to the surface before solidifying, causing reduced available friction. This can occur if either an improper mixture is used or the applied asphalt is not sufficiently cooled before the roadway is open for public travel. This evidence reasonably supported the trial court's finding that flushing began to manifest itself when ODOT staff were, or should have been, at the construction site. Further, considering that the evidence showed the poor friction testing results occurred so soon (within six months) after the repaved road opened for travel, the trial court reasonably concluded that ODOT did not take all the necessary steps to monitor and ensure the proper completion of the work. Thus, competent, credible evidence supported the trial court's finding that ODOT breached its duty to maintain SR 14 in a reasonably safe condition.

{¶ 27} Accordingly, we overrule ODOT's first assignment of error.

{¶ 28} In its second assignment of error, ODOT asserts the trial court erred in not either finding Pampley's negligence as the sole proximate cause of the accident or attributing more than 50 percent of proximate causation to his negligence. This assignment of error lacks merit.

{¶ 29} Negligence is without legal consequence unless it is a proximate cause of an injury. *Whiting v. Ohio Dept. of Mental Health*, 141 Ohio App.3d 198, 202 (10th Dist.2001), citing *Osler v. Lorain*, 28 Ohio St.3d 345, 347 (1986). The rule of proximate cause "requires that the injury sustained shall be the natural and probable consequence of the negligence alleged; that is, such consequence as under the surrounding circumstances of the particular case might, and should have been foreseen or anticipated by the wrongdoer as likely to follow his negligent act." *Jeffers v. Olexo*, 43 Ohio St.3d 140, 143 (1989). An injury may be the result of more than one proximate cause. *Argabrite v. Neer*, 149 Ohio St.3d 349, 2016-Ohio-8374, ¶ 40. "Concurrent negligence consists of the negligence of two or more persons concurring, not necessarily in point of time, but in point of consequence, in producing a

single indivisible injury." *Garbe v. Halloran*, 150 Ohio St. 476 (1948), paragraph one of the syllabus.

{¶ 30} ODOT argues Pampley's negligence was the sole proximate cause of the accident. Williams, Pampley's passenger, testified that Pampley applied the vehicle's engine brake and then he lost control of the vehicle. Williams further indicated that Pampley should not have applied the engine brake under the circumstances. Consistent with Williams' testimony, Tuttle, ODOT's accident reconstruction expert, testified that the accident was caused because Pampley applied the engine brake, overcorrected the vehicle, and then lost complete control of the vehicle. Tuttle opined that any inadequate available friction on the road did not cause the accident. ODOT asserts that in view of this evidence, but for Pampley applying the engine brake, the tractor-trailer would have continued in its lane of travel and the accident would have been averted. While ODOT is correct that the testimony of Williams and Tuttle would have supported a finding that Pampley's negligence was the sole proximate cause of the accident, other evidence supported the trial court's finding that there was more than one proximate cause of the accident. As discussed above, Monique introduced testimony that the roadway had inadequate available friction at the time of the accident, and her expert, Yager, opined that the absence of adequate roadway friction caused the accident. Therefore, evidence supported a finding that ODOT's and Pampley's independent tortious conduct converged to cause the fatal accident.

{¶ 31} Because it found more than one tortfeasor, the trial court determined, pursuant to R.C. 2307.23, the percentage of tortious conduct attributable to ODOT and Pampley. The goal of apportionment is to ensure that no defendant pays more than its fair share of the plaintiff's damages. *Romig v. Baker Hi-Way Express, Inc.*, 5th Dist. No. 2011AP-02-0008, 2012-Ohio-321, ¶ 30. Under this framework, the trial court, as the factfinder, was required to decide the degree to which the negligent conduct of ODOT and Pampley each contributed to the fatal accident. The weighing of the respective negligence of multiple parties is inherently difficult, and ODOT has presented no compelling reason to alter the apportionment reached by the trial court. As set forth above, evidence supported a finding that tortious conduct of both ODOT and Pampley proximately caused the accident. This evidence demonstrated that ODOT's negligence resulted in a roadway with insufficient available friction and Pampley's negligence caused him to lose control of his

vehicle. Both of these contributing factors reasonably could be viewed as equally causing the fatal accident. Therefore, based on our review of the record, we find competent, credible evidence supported the trial court's decision to attribute 50 percent of fault to ODOT's tortious conduct and 50 percent to Pampley's tortious conduct.

{¶ 32} For these reasons, we overrule ODOT's second assignment of error.

{¶ 33} In ODOT's third assignment of error, it asserts the trial court erred in permitting the introduction of evidence relating to the October 2011 friction testing. It argues the evidence of the friction testing constituted inadmissible evidence of subsequent remedial measures. We disagree.

{¶ 34} Decisions regarding the admissibility of evidence lie within the broad discretion of the trial court. *State v. Hymore*, 9 Ohio St.2d 122, 128 (1967). As a result, a decision by the trial court to admit or exclude evidence will be upheld on appeal absent an abuse of discretion by the trial court. *O'Brien v. Angley*, 63 Ohio St.2d 159, 164-65 (1980); *Beard v. Meridia Huron Hosp.*, 106 Ohio St.3d 237, 2005-Ohio-4787, ¶ 20.

{¶ 35} Evidence of subsequent remedial measures is inadmissible to prove negligence. Evid.R. 407 provides: "[w]hen, after an injury or harm allegedly caused by an event, measures are taken which, if taken previously, would have made the injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event." However, "[t]his rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment." Evid.R. 407. One "justification for the rule is that evidence of subsequent remedial measures is thought to have minimal or nonexistent probative value in establishing negligence." *McFarland v. Bruno Mach. Corp.*, 68 Ohio St.3d 305, 307-08 (1994). Another justification is the social policy of encouraging repairs or corrections. *Id.*

{¶ 36} Here, in response to Chief Powers' concerns regarding SR 14, ODOT friction tested the roadway. Due to the results of those tests, ODOT performed diamond grinding of the roadway to increase its available friction. As to the diamond grinding, the trial court sustained ODOT's objection to the admission of evidence regarding that action. However,

the trial court permitted, over ODOT's objection, the admission of the evidence concerning the friction testing performed in October 2011.

{¶ 37} We find the trial court appropriately determined that the diamond grinding was a subsequent remedial measure but the friction testing was not. While our research does not reveal any Ohio case directly on point, we agree with the reasoning of the majority of jurisdictions outside Ohio concluding that post-incident investigations are admissible. *See J.B. Hunt Transport, Inc. v. Zak*, 58 N.E.3d 956, 966 (Ind.App.2016) (observing that the "majority of jurisdictions agree that a post-incident investigation and report of the investigation do not constitute inadmissible subsequent remedial measures").[2] The testing of SR 14 in October 2011 was performed to determine whether there was a problem in regard to the available friction of the roadway. The friction testing of the roadway did not, in any way, change the condition of the hazard. Only when a measure was taken to alter the available friction of the roadway, by means of diamond grinding, did the hazard as it existed change. Thus, in this situation, the remedial measure was the diamond grinding of the roadway, not the testing performed to identify the extent of a hazard. Consequently, we find the trial court did not abuse its discretion in admitting the evidence regarding the October 2011 friction testing.

{¶ 38} Accordingly, we overrule ODOT's third assignment of error.

{¶ 39} ODOT's fourth assignment of error contends the trial court's non-economic damages award was excessive. According to ODOT, the factual circumstances of this case warranted a non-economic damages award far below the $2,500,000 actually awarded. We find the trial court's award is supported by the evidence.

{¶ 40} R.C. 2125.02(A)(2) provides that the court, if the civil action for wrongful death is not tried to a jury, "may award damages authorized by division (B) of this section, as it determines are proportioned to the injury and loss" suffered by the beneficiaries. The compensatory damages listed in R.C. 2125.02(B) include: "(1) Loss of support from the

---

[2] In its reply brief, ODOT cites *Worrell v. Norfolk & W. Ry. Co.*, 94 Ohio App.3d 133 (6th Dist.1994), for the principle that experiments or tests relating to an accident are inadmissible as subsequent remedial measures. However, while *Worrell* involved the issue of a subsequent remedial measure, the court did not hold that experiments or tests subsequent to an accident are inadmissible subsequent remedial measures under Evid.R. 407. *See id.* at 136-37 ("the remedial measure was the removal of the box [that had fallen on the plaintiff] from the file room" together with the decision not to return the box to the file room after experiments were done on the box to evaluate its safety).

reasonably expected earning capacity of the decedent; (2) Loss of services of the decedent; (3) Loss of the society of the decedent, including loss of companionship, consortium, care, assistance, attention, protection, advice, guidance, counsel, instruction, training, and education, suffered by the surviving spouse, dependent children, parents, or next of kin of the decedent; (4) Loss of prospective inheritance to the decedent's heirs at law at the time of the decedent's death; [and] (5) The mental anguish incurred by the surviving spouse, dependent children, parents, or next of kin of the decedent." "[T]he assessment of damages lies 'so thoroughly within the province of the [trier of fact] that a reviewing court is not at liberty to disturb the [trier of fact's] assessment' absent an affirmative finding of passion and prejudice or a finding that the award is manifestly excessive or inadequate." *Pesic v. Pezo*, 8th Dist. No. 90855, 2008-Ohio-5738, ¶ 21, quoting *Moskovitz v. Mt. Sinai Med. Ctr.*, 69 Ohio St.3d 638, 655 (1994).

{¶ 41} ODOT argues the trial court's non-economic damages award was the result of sympathy for Monique, not reason. We disagree. The trial court thoughtfully considered the deep and profound impact Dennis' death has had on Monique. Competent, credible evidence showed that, in the years following her husband's death, Monique's physical and mental health has continued to deteriorate. Monique, as well as her family and friends, testified regarding the extent the loss of her husband has negatively affected her life. The testimony demonstrated that before his death, Monique was healthy and positive, but she has been physically and mentally failing since his death. Thus, the trial court reasonably found that the loss of Dennis has removed the major source of her happiness and emotional well-being, and that she has endured significant mental anguish as a result his death. We agree with ODOT that the trial court's damages award of $2,500,000 for Monique's loss of society and mental anguish is remarkably high. And ODOT is correct that this amount is more than non-economic damages awarded to other surviving spouses in at least two other wrongful death actions involving ODOT. ODOT cites *Reed v. Ohio Dept. of Transp.,* Ct. of Cl. No. 2010-02065, 2013-Ohio-1515, and *Miller v. Ohio Dept. of Transp.*, Ct. of Cl. No. 2009-07679, 2013-Ohio-3635, wherein the Court of Claims of Ohio, based on the particular facts and circumstances before it, awarded $1,000,000 in non-economic damages to the surviving spouses of decedents who died as a result of ODOT's negligence. However, the amounts awarded in those cases did not somehow limit the Court of Claims' ability to

evaluate this case independently and determine the level of loss of society and mental anguish borne by Monique. In the final analysis, given the profoundly damaging impact Dennis' death has had on Monique, we cannot conclude that this award was the result of passion, prejudice, sympathy, or any other impermissible basis, or that it was manifestly excessive.

{¶ 42} Because the trial court's award of $2,500,000 for non-economic damages was supported by the record, we overrule ODOT's fourth assignment of error.

{¶ 43} In her sole assignment of error, Monique contends the trial court erred in reducing her recovery by $885,000 based on the sum received by her husband's estate as settlement proceeds from his uninsured motorist insurance carriers. We agree.

{¶ 44} R.C. 2743.02(D) provides that "[r]ecoveries against the state shall be reduced by the aggregate of insurance proceeds, disability award, or other collateral recovery received by the claimant." Pursuant to the plain language of this statute, a plaintiff's recovery against the state must be reduced by any insurance proceeds received by the plaintiff. However, to comply with constitutional requirements, R.C. 2743.02(D) contains an implicit "matching" requirement. *Nevins* at 22. In *Buchman v. Bd. of Edn.*, 73 Ohio St.3d 260 (1995), the Supreme Court of Ohio held that to meet constitutional due process requirements, "collateral benefit offset statutes" must require "deductible benefits be matched to those losses actually awarded by the jury." *Id.* at 269. Thus, in *Buchman*, the court "found that a collateral benefit could only be deducted from the jury's award if some portion of that jury award corresponded to the collateral benefit." *Van Der Veer v. Ohio Dept. of Transp.*, 113 Ohio App.3d 60, 69 (10th Dist.1996), citing *Buchman* at 265. Stated differently, a collateral benefits deduction statute is constitutional if it is "susceptible of an interpretation that requires the matching of deductible benefits to damages actually awarded." *McMullen v. Ohio State Univ. Hosps.*, 88 Ohio St.3d 332, 343 (2000), citing *Buchman*. Therefore, the matching requirement mandates that a collateral benefit reduces an award against ODOT pursuant to R.C. 2743.02(D) only to the extent that the loss for which it collaterally compensates is included in the award against ODOT.

{¶ 45} Here, the trial court determined ODOT and Pampley were equally at fault concurrent tortfeasors and, accordingly, found both liable for an equal proportionate share (50 percent each) of the total damages awarded. *See* R.C. 2307.22 (setting forth

proportionate share liability calculation based on attribution of the tortious conduct); R.C. 2307.23 (requiring trier of fact to determine percentage of tortious conduct attributable to each party). Further, the insurance proceeds received by Dennis' estate was compensation for loss caused by an uninsured negligent driver. Thus, the loss for which the $885,000 compensates is the loss caused by the driver, Pampley, who the trial court determined was 50 percent responsible for the accident. This payment cannot be matched to the award against ODOT. Therefore, the trial court erroneously deducted the $885,000 from the damages awarded against ODOT.

{¶ 46} For these reasons, we sustain Monique's sole assignment of error.

## IV. Disposition

{¶ 47} Having overruled ODOT's first, second, third, and fourth assignments of error and sustained Monique's sole assignment of error, we affirm in part and reverse in part the judgment of the Court of Claims of Ohio and remand this matter to that court for further proceedings consistent with law and this decision.

*Judgment affirmed in part and reversed in part;*
*cause remanded.*

DORRIAN, J., concurs.
SADLER, J., concurs in part and dissents in part.

SADLER, J., concurring in part and dissenting in part.

{¶ 48} Because I agree with the majority's resolution of the four assignments of error of the Ohio Department of Transportation ("ODOT") but disagree with their resolution of Monique's single assignment of error, I respectfully concur in part and dissent in part.

{¶ 49} R.C. 2743.02(D) provides, in relevant part, that "[r]ecoveries against the state shall be reduced by the aggregate of insurance proceeds, disability award, or other collateral recovery received by the claimant." The constitutionality of R.C. 2743.02(D) under both the equal protection and due process clauses of the Ohio and United States Constitutions has been previously upheld by this court in *Van Der Veer v. Ohio Dept. of Transp.*, 113 Ohio App.3d 60 (10th Dist.1996). In that case, the issue for this court was whether the Court of Claims of Ohio had erred when it treated the proceeds from several of the decedent's life insurance policies as a collateral benefit under R.C. 2743.02(D) and deducted those proceeds from the stipulated award of damages against the state. In upholding the Court

of Claims' judgment, this court noted the deduction required under R.C. 2743.02(D) promoted the "valid governmental interest" of "[b]oth conserving fiscal resources and providing recovery for injured persons, who have no source of reimbursement for their damages." *Id.* at 65. In finding R.C. 2743.02(D) required deduction of life insurance proceeds from claimant's recovery against the state, this court noted "the legislature chose not to make distinctions between various types of insurance but chose to include all insurance proceeds. Such a distinction is better left to the legislature." *Id.* at 69.

{¶ 50} In *Community Ins. Co. v. Ohio Dept. of Transp.*, 92 Ohio St.3d 376 (2001), the Supreme Court of Ohio determined medical insurance payments made to the insured claimant from her employer's medical insurance carrier constituted deductible collateral benefits under R.C. 2743.02(D). In that case, plaintiff, the insurance company, paid the insured's hospital and medical expenses when she suffered a spinal cord injury after her vehicle collided with an unguarded light pole on Interstate 77. The insured subsequently brought suit against ODOT, and the Court of Claims awarded the insured $8.3 million in damages, with a 40 percent reduction for the claimant's comparative negligence. Applying R.C. 2743.02(D), the Court of Claims deducted the $245,000 payment made by the insurer from the total award.

{¶ 51} The insurance company subsequently filed a complaint against ODOT seeking recovery of 60 percent of the $245,000 the insurer had paid to the insured. The Supreme Court, interpreting R.C. 2743.02(D), held "an insurer who has been granted a right of subrogation by a person on whose behalf the insurer has paid medical expenses incurred as the result of tortious conduct of the state is subject to R.C. 2743.02(D)." *Id.* at 379. The court found R.C. 2743.02(D) mandated the medical benefits the insured received from her insurer be deducted from the amount due to her insurer from the state because the insured "could not transfer to [her insurer], by way of subrogation, a right to recover damages representing incurred medical expenses that [the insured] herself did not possess pursuant to R.C. 2743.02(D)." *Id.* at 378.

{¶ 52} Here, the $885,000 received by the claimant represents a payment from Monique's uninsured motorist carrier for a liability shared by the state. Under *Van Der Veer* and *Community Ins.*, the payment to Monique from a policy of insurance owned by Monique is a collateral recovery subject to the set-off provisions in R.C. 2743.02(D). As we

noted in *Van Der Veer,* the General Assembly, in enacting R.C. 2743.02(D), chose to include all insurance proceeds in its scope and did not exclude recovery from uninsured motorist insurance. As to the constitutionality of R.C. 2743.02(D) as applied in this case, the reduction from Monique's recovery against ODOT does not offend due process or equal protection because the deductible benefit matched an amount of damages the Court of Claims actually awarded to Monique. *Van Der Veer* at 65.

{¶ 53} The majority holds the Court of Claims erred when it reduced Monique's recovery against ODOT by the insurance proceeds she received from her uninsured motorist carrier. In so holding, the majority relies on the decision of the Supreme Court in *Buchman v. Wayne Trace Local School Dist. Bd. of Edn.*, 73 Ohio St.3d 260 (1995), and the decision of this court in *Nevins v. Ohio Dept. of Transp.*, 132 Ohio App.3d 6 (10th Dist.1998). I find those cases to be legally and factually distinguishable.

{¶ 54} The *Buchman* case involved the deduction from an award against a political subdivision of Social Security and Medicare benefits paid to decedent's children. The Supreme Court found even though Social Security and Medicare benefits are the type of collateral source benefits deductible under R.C. 2744.05(B), such benefits were not deductible from the award to plaintiff because they were paid to plaintiff's children and could not be matched to an amount of damages awarded to plaintiff. *Buchman* at 265. *Buchman* holds that due process requires collateral benefits be deducted from a recovery belonging to the party whose recovery is to be offset. *Id.* In other words, due process does not allow one party's recovery to be reduced by another person's collateral benefits. *Id.*

{¶ 55} Here, unlike the collateral benefits paid to plaintiff's children in *Buchman*, the insurance proceeds for which the state seeks to reduce Monique's award in this case can be matched directly to recovery received by Monique as a result of the Court of Claims' verdict. There is no question the $885,000 payment to Monique from her uninsured motorist carrier corresponds to an award of damages to Monique. Contrary to the conclusion reached by the majority, *Buchman* does not require the Court of Claims to match the collateral benefit to a particular joint tortfeasor in order for the deduction to be lawful.[3]

---

[3] Section 16, Article I of the Ohio Constitution provides as follows:

{¶ 56} Similarly, *Nevins* does not support the majority decision.[4] In *Nevins*, three members of plaintiffs' family died when their car struck a concrete divider in a gore median on a highway interchange. Plaintiffs sued ODOT and its contractor, alleging negligence in the maintenance of the interchange. The case against ODOT was tried to the court, while the case against defendant contractor was tried to a jury. Damages were awarded against each defendant in proportion to the negligence that each party exhibited, $1,570,000.00 against ODOT and $1,654,417.62 against the contractor. The Court of Claims rejected ODOT's argument that R.C. 2743.02(D) required the award against it to be reduced by the award against the contractor.

{¶ 57} In overruling ODOT's assignment of error related to the set off, this court determined the payment by the contractor of its proportionate share of the total damage award was not "collateral recovery received by the claimant," as that term is used in R.C. 2743.02(D). This court explained its ruling as follows:

> The [estate's] damages attributable to [the contractor] are, therefore, not collateral to or additional to ODOT's share, but are part of the primary damages awarded to the [estate]. The damages awarded against [the contractor] make up their share of the one hundred percent total damages awarded to the [estate], and are not a collateral source under R.C. 2743.02(D). Therefore, the trial court did not err in refusing to set off ODOT's damages against those of [the contractor].

*Nevins* at 22.

{¶ 58} Though this court in *Nevins* referred to the matching requirement in *Buchman* when discussing the application of R.C. 2743.02(D), the basis of the decision in *Nevins* was this court's recognition that direct payment to the claimant by a joint tortfeasor is not a collateral recovery for purposes of R.C. 2743.02(D). When viewed in the proper

---

> All courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law, and shall have justice administered without denial or delay.
>
> [*Suits against the state.*] *Suits may be brought against the state, in such courts and in such manner, as may be provided by law.*

(Emphasis added.)
[4] Bryant, J., concurs in part and dissents in part on other issues.

context, the circumstances in *Nevins* are more akin to the circumstances confronted by the Supreme Court in *Heritage Ins. Co. v. Ohio Dept. of Transp.*, 10th Dist. No. 02AP-838, 2003-Ohio-3111. In that case, a motorist died when her car collided with a truck belonging to a contractor hired by ODOT to make improvements where the collision occurred. The motorist's estate successfully sued the contractor in common pleas court, and a jury awarded an amount of damages representing 100 percent of the loss. The contractor's insurer, Heritage, paid the estate all its damages, less the deductible paid by the contractor.

{¶ 59} Heritage and the contractor then brought suit against ODOT in the Court of Claims seeking indemnity and/or contribution. The Court of Claims dismissed the suit, concluding that neither Heritage nor the contractor could recover anything from ODOT because R.C. 2743.02(D) required recoveries against the state be reduced by any collateral recovery received by the claimant. Heritage appealed and this court reversed.

{¶ 60} In *Heritage*, the Supreme Court was presented with the question of whether R.C. 2743.02(D) prevented a joint tortfeasor or the joint tortfeasor's insurer from seeking contribution or indemnity from the state for damages paid to the injured claimant. *Heritage* at ¶ 6. The Supreme Court found because a joint tortfeasor and the joint tortfeasor's insurer were not "the claimant" for purposes of R.C. 2743.02(D), R.C. 2743.02(D) did not preclude a joint tortfeasor from seeking contribution or indemnity from the state. *Id.* at ¶ 8 (*Community Ins.* distinguished because it involved the payment of insurance proceeds to the claimant by the claimant's own insurer).

{¶ 61} The *Nevins* case does not speak to the same collateral recovery issue presented in this case. *Nevins* and *Heritage* involve a direct payment to the claimant by a joint tortfeasor or the joint tortfeasor's insurance carrier. Such payments are not considered collateral recovery to the claimant under R.C. 2743.02(D). Unlike the present case, *Nevins* does not involve insurance proceeds paid to the claimant from a policy of insurance owned by the claimant. Consequently, *Nevins* did not preclude the Court of Claims from reducing Monique's recovery against ODOT by the insurance proceeds actually received from Monique's own policies.

{¶ 62} The case before us involves insurance proceeds Monique received from her uninsured motorist carrier. As stated by this court in *Van Der Veer*, "the legislature chose not to make distinctions between various types of insurance but chose to include all

insurance proceeds.  Such a distinction is better left to the legislature." *Van Der Veer* at 69. The language of R.C. 2743.02(D) continues to require that "[r]ecoveries against the state shall be reduced by the aggregate of insurance proceeds, disability award, or other collateral recovery received by the claimant."  Accordingly, the statute compelled the trial court to deduct the insurance proceeds Monqiue received from her uninsured motorist carrier from her recovery from ODOT.

{¶ 63} For the foregoing reasons, I would overrule Monique's sole assignment of error, as well as the four assignments of error raised by ODOT.  Because the majority does otherwise, I respectfully concur in part and dissent in part.

---